UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

**SCOPIA WINDMILL FUND LP; SCOPIA PX LLC; SCOPIA PX INTERNATIONAL MASTER FUND LP; SCOPIA PARTNERS LLC; SCOPIA LONG QP LLC; SCOPIA LONG LLC; SCOPIA LONG INTERNATIONAL MASTER FUND LP; SCOPIA LB LLC; SCOPIA LB INTERNATIONAL MASTER FUND LP; AND SCOPIA INTERNATIONAL MASTER FUND LP;**

               Plaintiffs,

               v.

**SIGNET JEWELERS LIMITED, MICHAEL BARNES, RONALD RISTAU, MARK LIGHT, VIRGINIA DROSOS, and MICHELE SANTANA,**

               Defendants.

-------------------------------------------------------------------x

No.

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND THE COMMON LAW**

JURY TRIAL DEMANDED

       Plaintiffs Scopia Windmill Fund LP; Scopia PX LLC; Scopia PX International Master Fund LP; Scopia Partners LLC; Scopia Long QP LLC; Scopia Long LLC; Scopia Long International Master Fund LP; Scopia LB LLC; Scopia LB International Master Fund LP; and Scopia International Master Fund LP (collectively, the "Scopia Funds" or "Plaintiffs") are investment funds that purchased the common stock of Defendant Signet Jewelers Limited ("Signet" or the "Company").  Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, sue Signet and certain of its former executives, Michael Barnes (Signet's former Chief Executive Officer ("CEO")), Ronald Ristau (Signet's former Chief Financial Officer ("CFO")), Mark Light (Signet's former CEO), and current executives Virginia Drosos (Signet's CEO), and Michele Santana (Signet's CFO) (collectively, the "Executive Defendants" and with Signet, "Defendants").  Plaintiffs allege the following upon personal

1

knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief as to allegations concerning matters other than itself and its own acts is based upon the investigation conducted by and through counsel, which included, among other things, the review and analysis of: (i) the Fifth Amended Class Action Complaint for Violations of the Federal Securities Laws filed in *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.) (the "Class Action Complaint"); (ii) the Decision and Order Denying Defendants' Motion to Dismiss the Fifth Amended Class Action Complaint in *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.) (the "Motion to Dismiss Opinion"); (iii) the Decision and Order Denying Defendants' Motion for Judgment on the Pleadings in *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.); (iv) other filings in *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.) (the matter being referred to generally as the "Class Action"); (v) transcripts, press releases, news articles, and other public statements issued by or concerning Signet and the Executive Defendants; (vi) research reports issued by financial analysts concerning the Company; (vii) reports and other documents filed publicly by Signet with the U.S. Securities and Exchange Commission ("SEC"); (viii) Signet's corporate website; and (ix) other publicly available information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiffs bring this action under the federal securities laws and under the common law to recover the investment losses they suffered as a result of false and misleading statements that Signet and its executives made to induce Plaintiffs to purchase the common stock of Signet. Defendants' misrepresentations to Plaintiffs caused Plaintiffs to suffer significant investment losses when the truth was revealed.

2.      Before and during the Relevant Period[1] to this action, Defendants were concealing Signet's pervasive culture of sexual harassment – and the business impact that revelation of that culture would have to investors. In 2008, Signet was sued by a class of female employees alleging gender discrimination in pay and promotion decisions. Pursuant to arbitration agreements Signet required its employees to sign, the matter was referred to arbitration and kept confidential. Signet repeatedly minimized the matter in its disclosures, assuring investors that the matter concerned Signet's "store-level" practices at a "few" stores, asserting that these limited practices were allegedly "discriminatory as to compensation and promotional activities," and stating that the Company had investigated the allegations and found them to be unsubstantiated. At the same time, Signet further assured investors that it adhered to the highest level of ethics in conducting its business. Signet repeatedly stated that it made employment decisions "solely" on merit, and was "committed to a workplace that is free from sexual . . . or other unlawful harassment . . . . Abusive, harassing or other offensive conduct is unacceptable . . . .".

3.      Prior to the beginning of the Relevant Period, and contrary to its statements, Signet had been provided at least 250 sworn declarations from at least 200 employees detailing widespread and pervasive instances of sexual harassment by senior Signet employees. Contrary to Defendants' statements that the arbitration concerned only limited, unsubstantiated "store-level practices . . . as to compensation and promotional activities," the evidence in front of Signet showed a consistent and pervasive culture of severe sexual harassment.  Further, the evidence showed that the harassment was conducted by the Company's senior executives, including Defendant Light.  Scores of declarations detailed, among other things, routine instances of sexual harassment of female subordinates by male superiors – including high-level executives – at Signet's annual Managers' Meetings, as well as regular instances of female employees being pressured into sexual activity with their male superiors in order to obtain promotions and other economic advances, or even to just keep their jobs and livelihoods.  As one former Signet employee

---

[1] The Relevant Period for this action, representing the time when Plaintiffs purchased Signet common stock is 12/2/16 to 2/1/17.

stated in her declaration, "[s]exual harassment regularly occurred in Sterling [a Signet brand]. The Company's top level executives fostered this behavior and this culture of sexual discrimination at the Company because they actively participated in it."

4.      As Defendants knew, but concealed, the existence of this culture of sexual harassment posed a severe, and acute, risk to Signet's business and reputation. This was because Signet's key product – diamond bridal jewelry – was targeted to female consumers.   The reputational damage that would occur for any company upon revelation of a culture of sexual harassment would be significant; but for Signet, it would be particularly severe because of its product lines and consumer segment focus.   Moreover, as Defendants repeatedly told investors, "trust" was essential to its sales model, because its product was an "emotional" one that was sold in face- to-face settings. According to Signet, trust was the single most important factor impacting a consumer's decision to buy jewelry at Signet's stores. If the facts demonstrating the existence of pervasive sexual harassment at Signet became public, it would alienate the recipients of Signet's flagship products, seriously compromise the trust on which its sales model depended, and significantly damage the Company's business, reputation, and stock price.

5.      Thus, while publicly minimizing the allegations and facts in the arbitration, and touting its own ethical business conduct, Defendants strove to keep this explosive evidence hidden from public view. Since at least 2015, the media had sought to access the declarations, which were kept confidential under arbitration rules. Defendants resisted disclosure for years – successfully.

6.      As the Court in the Class Action summarized is its June 20, 2019 Order:

[Signet] falsely touted the company's merits-based corporate culture, its commitment to preventing sexual harassment and disciplining offenders, its providing employees with a means to safely and anonymously report misconduct without fear of reprisal, and that Signet's senior officers and directors specifically adhered to Signet's code of conduct in recognition that the company sought to conduct its business with honesty and integrity.

Those representations were made in Signet's code of conduct, a document that was incorporated by reference in Signet's SEC filings and posted on the company's website during the Class Period, including after Jock was filed.

As alleged . . .  those representations were false, because Signet, among other things: made certain employment decisions, not on merit, but on the basis of whether female subordinate

4

employees acceded to the sexual demands of male supervisors; retaliated against women who utilized the company's purported anonymous reporting mechanism; and tolerated, rather than disciplined, misconduct.

[Citations omitted throughout]

7.     As the Court overseeing the Class Action further summarized in its June 20th Order: "Signet's code of conduct and ethics – again, reincorporated by reference in Signet's SEC filings and posted on Signet's website after Jock was filed – touted certain values and practices that constitute the exact opposite of what the company allegedly valued and practiced."

8.     And as the Court overseeing the Class Action summarized in its June 11th Order: "a reasonable investor – who otherwise would be concerned about how grave allegations concerning rampant sexual misconduct might affect her investment in Signet – took Defendants at their word.  Signet's "word" was not truthful."

9.     It was not until February 27, 2017, when the declarations regarding sexual harassment were finally made public – albeit still with "company-approved" redactions – that investors learned the truth about sexual harassment at Signet. That evening, after the close of market, The Washington Post published a blockbuster article entitled "Hundreds allege sex harassment, discrimination at Kay and Jared jewelry company." The article detailed Signet's pervasive culture of sexual harassment, reaching all the way up to the highest levels of the Company, and quoted and summarized many of the declarations evidencing that fact.

10.     Investors were shocked, and they fled the Company in droves. On February 28, 2017, Signet's stock priced opened sharply down, and by midday had declined 8%. Desperate to arrest this nosedive, Signet took the extraordinary action of halting trading so that it could prepare a public statement. In this statement, Signet reiterated its prior mischaracterization of the arbitration as involving "a very small number of individuals," whose assertions had been "thoroughly investigated" and were "not substantiated."

11.     The market disagreed. When trading resumed, Signet's stock price continued its collapse. By the close of market on February 28, 2017, Signet's stock price had lost 13% of its value on extraordinary trading volume of more than 11 million shares.  As the media continued to

cover the revelation, leaking additional information into the market, and the risk Signet had concealed materialized, Signet's stock also fell on March 7th, 10th, 13th, and 14th.

12.     On July 17, 2017, Signet announced that Defendant Light would step down after more than 30 years with Signet. Signet and Light offered scant explanation for his departure, with Light citing a "need to address some health issues" and stating that "the Board and I agreed that it is a good time for a transition." The media noted that, given the Company's troubles, Light's departure was "also an opportunity to bring fresh eyes to a business that clearly needs new direction."

13.     On December 6, 2017, a broad bipartisan group of members of Congress introduced legislation to prevent companies from forcing employees to arbitrate sexual harassment claims. Representative Cheri Bustos, the chief sponsor of the bill, stated that the impetus for this legislation was Signet's use of forced arbitration to conceal pervasive sexual harassment by its senior executives. As she stated, the declarations detailed herein "painted a troubling picture of a corporate culture that fostered systemic sexual harassment," and Signet had used the sealed arbitration process in an effort to ensure that those facts "would never see the light of day." The Company's misconduct, she stated, had therefore spurred Congress "to address institutionalized sexual harassment."

14.     In April 2019, a New York Time Magazine expose laid bare further information about Signet's culture of sexual harassment and exploitation, including alleged instances of rape and quid-pro-quo sexual harassment events that Signet swept under the rug via its internal "Resolve" system.  The expose provided an extensive amount of information that Signet knew about these events and its culture, and concealed them from investors – including Scopia.

15.     In reliance on the truth of Signet's filings, and on the market price for Signet stock, Plaintiffs purchased tens of millions of dollars in Signet stock between December 2, 2016 and February 1, 2017, and suffered millions of dollars in damages when Signet's fraud was revealed.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78r and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

17.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Certain of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District and Plaintiffs' investment manager, Scopia Capital Management ("SCM"), is located in this District.

19.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## PARTIES

20.     Plaintiff Scopia Windmill Fund LP is a Delaware limited partnership with a main office in New York, New York, managed by SCM.   The dates on which Scopia Windmill Fund LP purchased or acquired Signet common stock during the Relevant Period are attached hereto as Exhibit A.

21.     Plaintiff Scopia PX LLC is a Delaware limited liability company with a main office in New York, New York, managed by SCM. The dates on which Scopia PX LLC purchased or acquired Signet common stock during the Relevant Period are attached hereto as Exhibit B.

22.     Plaintiff Scopia PX International Master Fund LP is a Bermuda limited partnership with a main office in New York, New York, managed by SCM. The dates on which Scopia PX International Master Fund LP purchased or acquired Signet common stock during the Relevant Period are attached hereto as Exhibit C.

7

23.     Plaintiff Scopia Partners LLC is a Delaware limited liability company with a main office in New York, New York, managed by SCM.  The dates on which Scopia Partners LLC purchased or acquired Signet common stock during the Relevant Period are attached hereto as Exhibit D.

24.     Plaintiff Scopia Long QP LLC is a Delaware limited liability company with a main office in New York, New York, managed by SCM.  The Scopia Long QP LLC purchased or acquired Signet common stock during the Relevant Period are attached hereto as Exhibit E.

25.     Plaintiff Scopia Long LLC is a Delaware limited liability company with a main office in New York, New York, managed by SCM.  The dates on which Scopia Long LLC purchased or acquired Signet common stock during the Relevant Period are attached hereto as Exhibit F.

26.     Plaintiff Scopia Long International Master Fund LP is a Bermuda limited partnership with a main office in New York, New York, managed by SCM.  The dates on which Scopia Long International Master Fund LP purchased or acquired Signet common stock during the Relevant Period are attached hereto as Exhibit G.

27.     Plaintiff Scopia LB LLC is a Delaware limited liability company with a main office in New York, New York, managed by SCM.  The dates on which Scopia LB LLC purchased or acquired Signet common stock during the Relevant Period are attached hereto as Exhibit H.

28.     Plaintiff Scopia LB International Master Fund LP is a Bermuda limited partnership with a main office in New York, New York, managed by SCM.  The dates on which Scopia LB International Master Fund LP purchased or acquired Signet common stock during the Relevant Period are attached hereto as Exhibit I.

29.     Plaintiff Scopia International Master Fund LP is a Bermuda limited partnership with a main office in New York, New York, managed by SCM.  The dates on which Scopia International Master Fund LP purchased or acquired Signet common stock during the Relevant Period are attached hereto as Exhibit J.

30.     Defendant Signet Jewelers Limited is a Bermuda corporation with headquarters located in Akron, Ohio and with its Corporate and Distribution facility located in Irving, Texas. Signet is purportedly the world's largest retailer of diamond jewelry. The Company wholly owns Sterling Jewelers, Inc. ("Sterling"), through which it operates retail stores under the brand names Kay Jewelers ("Kay") and Jared The Galleria of Jewelry ("Jared"), among others. The Company also wholly owns Zale Corporation, through which it operates retail stores under brand names including "Zales The Diamond Store" ("Zales") and "Piercing Pagoda."

31.     Defendant Michael Barnes ("Barnes") served as Chief Executive Officer and as a Director of Signet from January 2011 until October 31, 2014.

32.     Defendant Mark Light ("Light") was the Chief Executive Officer ("CEO") and a Director of Signet during the Relevant Period. Light became CEO and a Director of Signet on November 1, 2014. Prior to becoming CEO of Signet, Light served as President and Chief Operating Officer of Signet and CEO of its Sterling Jewelers division, and held senior leadership positions with Signet and the Sterling division for over 25 years. According to the Company's website, Light "has broad and deep knowledge of Signet's business and the jewelry industry" and "has extensive knowledge of Signet's operations." Light resigned on July 31, 2017 and was replaced by Virginia Drosos ("Drosos") on August 1, 2017.

33.     Defendant Ronald Ristau ("Ristau") served as Chief Financial Officer ("CFO") of Signet from April 2010 until July 31, 2014.  On information and belief, Ristau resides in the State of New York and resided in the State of New York during the Relevant Period.

34.     Defendant Michele Santana ("Santana") became CFO of Signet on August 1, 2014, and continues to hold that position.

35.     Defendant Drosos became CEO of Signet on August 1, 2017, and continues to hold that position.

36.     Barnes, Light, Ristau, Santana, and Drosos are collectively referred to herein as the "Executive Defendants." The Executive Defendants, because of their high-ranking positions and direct involvement in the everyday business of Signet and its subsidiaries, directly participated in

9

the management of Signet's operations, including its public reporting functions, had the ability to, and did control, Signet's conduct, and were privy to confidential information concerning Signet and its business, operations and financial statements, as alleged herein.

37.     Signet and the Executive Defendants together are sometimes collectively referred to herein as the "Defendants."

## SUMMARY OF THE FRAUD

38.     Signet misled investors about a culture of rampant and pervasive sexual harassment at Signet as well as the nature and impact of certain litigations that had been initiated against Signet relating to its culture of sexual harassment.

39.     While the existence of such a culture would be of importance to any investor, it was particularly important to investors in Signet stock. This is because the Company's principal product, bridal and other jewelry, was primarily marketed to a female audience and purchased for women. Further, as the Company repeatedly told investors, Signet's business was built on a foundation of trust, and that trust was cultivated by its employees. For precisely this reason, the Company stated that its June 24, 2015 investor presentation that its employees were "our most important competitive strength." The existence of pervasive sexual harassment at Signet seriously threatened to alienate the recipients of its products, and severely harm the trust that its business was built upon. It also threatened to severely harm the Company's relationship with the employees who were charged with creating that trust and building Signet's reputation.

### Signet Repeatedly Mischaracterized the *Jock* Actions and Made Misleading Statements Concerning the Conduct of Its Business

40.     On March 18, 2008, a class action lawsuit, captioned *Jock et al v. Sterling Jewelers, Inc.*, Case No. 1:08-cv-02875-(JSR), was filed in the United States District Court for the Southern District of New York (the "*Jock* Litigation").

41.     The *Jock* Litigation was filed on behalf of a class of current and former female employees of Sterling. It alleged that female Sterling employees were subjected to age and gender

discrimination, as well as sexually harassing comments and communications, while working there. On the basis of these allegations, the class brought claims against Sterling for violations of (i) Title VII of the Civil Rights Act, (ii) the Equal Pay Act, and (iii), on behalf of two of the named plaintiffs, for violations of the Age Discrimination in Employment Act.

42.     Sterling's employment agreements required that employees agree to arbitrate disputes arising out of their employment. On June 18, 2008, Judge Jed Rakoff referred the *Jock* Litigation to private arbitration, which was conducted by the American Arbitration Association Employment and Class Action Tribunal under case number 11-160-00655-08 (the "*Jock* Arbitration," and, collectively with the *Jock* Litigation, the "*Jock* Actions"), and stayed the *Jock* Litigation. Retired Judge Kathleen Roberts served as the arbitrator in the *Jock* Arbitration (the "Arbitrator"). The *Jock* Arbitration was initially kept confidential.

43.     On September 23, 2008, the United States Equal Employment Opportunities Commission also filed a lawsuit against Sterling, bringing claims under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 (the "EEOC Litigation," and, collectively with the *Jock* Actions, the "Actions").

44.     On June 21, 2013, claimants in the *Jock* Arbitration filed a memorandum in support of their motion for class certification (the "Class Certification Brief"). The Class Certification Brief attached declarations (the "Declarations") from hundreds of Sterling employees (the "Declarants") concerning their experiences at Sterling.

45.     Neither the Class Certification Brief nor the attached Declarations were initially made public. Although claimants in the *Jock* Arbitration sought to make the materials public, Signet resisted. Finally, in late 2013, counsel for plaintiffs in the *Jock* Actions, Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"), posted a version of the Class Certification Brief with Company-approved redactions (the "Redacted Class Certification Brief") on its website. The Declarations were not posted publicly at that time.

46.     The Redacted Class Certification Brief contained only limited information from the Declarations that was immediately relevant to class certification issues. While the brief asserted

that Defendant Light had engaged in certain instances of sexual harassment, the evidence for those assertions was largely obscured. The Company-approved redactions in the Redacted Class Certification Brief obscured, among other things, the names of many individuals and the nearly eight pages of the Class Certification Brief's Statement of Facts that specifically discussed the roles and activities of Sterling executives in Sterling's alleged discriminatory activity and provided "evidence of abusive treatment and sexualization of women employees."

47.     On February 2, 2015, the Arbitrator issued a ruling permitting the *Jock* Arbitration claimants to proceed with disparate impact claims on a class-wise basis (the "Class Award"). As with the Redacted Class Certification Brief, the Class Award contained only limited information concerning the underlying merits of the litigation, focusing instead on issues pertinent to its class certification determination. The Arbitrator permitted Cohen Milstein to post the Class Award on its website. Like the Redacted Class Certification Brief, the Class Award contained only limited information relevant to class certification issues.

48.     For its part, Signet repeatedly mischaracterized the Actions when it made (required) disclosures to investors in its filings with the SEC. Signet first disclosed the *Jock* Litigation in a Form 6-K it filed with the SEC on March 20, 2008. In its disclosure, Signet stated that the *Jock* Litigation (i) was based on allegations of discrimination in "store-level" employment practices concerning "compensation and promotional opportunities" made by a limited number of employees at a "few" stores, and (ii) that the Company had investigated the allegations and found them to be unsubstantiated:

> The lawsuit alleges Sterling Jewelers' US store -level employment practices are discriminatory as to compensation and promotional opportunities. The lawsuit is based on the allegations of 15 former and current employees working in a few stores. They allege that the subsidiary paid women less than men who performed similar work, and with favoring men over women for promotions. When these allegations first surfaced, they were investigated. That investigation failed to substantiate the allegations.

49.     In subsequent disclosures throughout 2008 and into 2009, Signet repeated its characterization of the *Jock* Litigation as alleging only that store-level employment activities were discriminatory with respect to pay and promotion.

50.     On March 25, 2009, Signet filed a Form 6-K with the SEC in which it revised its disclosure concerning the *Jock* Litigation to include language disclosing the EEOC Action. Signet added no substantive facts concerning the allegations underlying the lawsuits, stating only that:

> A class lawsuit for an unspecified amount has been filed against Sterling Jewelers Inc., a subsidiary of Signet Jewelers Limited, in the New York federal court by private plaintiffs. The US Equal Opportunities [sic] Commission has filed a separate lawsuit <u>alleging that US store-level employment practices are discriminatory as to compensation and promotional activities.</u>

51.     Signet substantially repeated this disclosure in its various SEC filings throughout 2009. By letter dated December 23, 2009, the SEC raised questions about the adequacy of Signet's disclosures. Among other things, the SEC asked Signet to supplement its disclosures concerning the Actions by "disclos[ing] the date the proceedings commenced, and briefly describ[ing] the factual basis alleged to underlie the class action proceeding."

52.     In a letter filed with the SEC on January 22, 2010 (the "January 2010 Letter"), Signet proposed including the following language in future filings, which did not substantially expand on its prior disclosures:

> In March 2008, a class action lawsuit for an unspecified amount was filed against Sterling Jewelers Inc, a subsidiary of Signet, in the U.S. District Court for the Southern District of New York federal court by private plaintiffs <u>alleging that US store-level employment practices are discriminatory as to compensation and promotional activities.</u> On September 23, 2008, the US Equal Employment Opportunities [sic] Commission ("EEOC") filed a lawsuit against Sterling in the U.S. District Court for the Western District of New York. The EEOC's lawsuit alleges that Sterling engaged in a pattern or practice of gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present. The EEOC asserts claims for unspecified monetary relief and non-monetary relief against the Company on behalf of a class of female employees subjected to these alleged practices. <u>The</u>

<u>Group denies the allegations from both parties and intends to defend
them vigorously.</u>

53.    Signet adopted the substantive characterization of the allegations in the Actions that
it proposed in the January 2010 letter in the litigation disclosure and litigation-related "Risk
Factors" sections of its SEC filings from 2010 through the end of the Relevant Period.

54.    In its Form 10-Q filed with the SEC on August 29, 2013, Signet first disclosed that,
in the *Jock* Arbitration, "[o]n June 21, 2013, pursuant to the briefing schedule ordered by the
Arbitrator, the Claimants filed their motion for class certification, disclosed their experts, and
produced their expert reports." Sterling did not disclose the existence or contents of the
Declarations at this time.

55.    Sterling first acknowledged the existence of the Declarations in its Form 10-Q filed
with the SEC on November 26, 2013, when it disclosed that "[i]n mid-October 2013, Sterling filed
its opposition to Claimants' class certification motion, its disclosure of its experts and their reports,
as well as three motions to exclude the reports of Claimants' experts and a motion to strike
Claimants' declarations and attorney summaries." Sterling said nothing further about the
Declarations in that filing, and made no further statements concerning the Declarations until after
February 28, 2017.

56.    Signet's attempts to minimize the Actions were largely successful: analysts paid
little attention to the Actions. News coverage of the Actions was similarly limited. Only a handful
of articles discussed the Actions in the period prior to February 26, 2017, and unsurprisingly none
of those addressed the extensive facts asserted in the Declarations.

57.    At the same time that Signet minimized the Actions in its public disclosures, it also
assured the market that it adhered to rigorous standards of ethics. Prior to and during the Relevant
Period, Signet repeatedly made available to investors its "Code of Conduct" and "Code of Ethics"
(collectively, the "Codes"). In its Form 20-F, filed with the SEC on April 1, 2009, Signet explained
that the Codes applied to senior officers, and adherence to them was of "vital importance":

In adopting both the Code of Ethics and the Code of Conduct, the Company has recognized the vital importance to the Company of conducting its business subject to high ethical standards and in full compliance with all applicable laws and, even where not required by law, with integrity and honesty.

58.     The Code of Conduct explained that (i) Signet was committed to a workplace free from sexual harassment, (ii) the Company based its employment and promotion decisions, among other things, "solely" on ability and potential in relation to job needs, (iii) the Company would protect persons who reported ethical concerns and had confidential and anonymous processes for reporting concerns, and (iv) sexual harassers would be disciplined. As the Code of Conduct explained (italics in original):

Maintaining a Safe, Healthy and Affirmative Workplace

The Company is an equal opportunity employer and bases our recruitment, employment, development and promotion decisions solely on a person's ability and potential in relation to the needs of the job, and complies with local, state and federal employment laws.

The Company is committed to a workplace that is free from sexual, racial, or other unlawful harassment, and from threats or acts of violence or physical intimidation. Abusive, harassing or other offensive conduct is unacceptable, whether verbal, physical or visual.

59.     The Code of Conduct further explained:

Those who violate the standards in this Code will be subject to disciplinary action.

* * *

It is the Company's policy to encourage the communication of bona fide concerns relating to the lawful and ethical conduct of business, and audit and accounting procedures or related matters. It is also the policy of the Company to protect those who communicate bona fide concerns from any retaliation for such reporting. Confidential and anonymous mechanisms for reporting concerns are available and are described in this Code.

60.     The Code of Ethics provided for additional duties for Signet's CEO, CFO, and other senior officers of Signet and its subsidiaries (collectively, the "Covered Officers"). As the Code of Ethics explained:

> In all of their dealings on behalf of, or with, the Company, each Covered Officer must
>
> Engage in and promote honest and ethical conduct . . . ;
>
> Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts . . . .

61.     The statements above from the Codes were substantially re-adopted each year by the Board and published on Signet's website before and during the Relevant Period. Signet also incorporated these documents by reference into SEC filings before and during the Relevant Period.

62.     Signet also repeatedly emphasized to the market that, given the nature of its business – selling jewelry, often engagement rings, in face-to-face settings – its business was built on a foundation of reputation and customer trust. Signet further stated that this reputation and trust were cultivated by its employees, who interacted directly with Signet's customers. Given the critical function of its employees, Signet specifically stated in its SEC filings that the Company had an "excellent" relationship with them.

**In Reality, And Contrary To Signet's Representations, Signet Had a Culture of Rampant and Pervasive Sexual Harassment Reaching Up To The Highest Levels Of The Company**

63.     Signet's disclosures and omissions successfully concealed an ugly truth: that Signet's culture was rife with sexual harassment of female employees, all the way up to the highest levels of the Company – including Signet's CEO, Mark Light.

64.     As set forth more fully below, the truth would not be revealed until February 2017, when versions of the Declarations, albeit still bearing Company-approved redactions obscuring the names of executives and managers who committed sexual harassment (the "Redacted Declarations"), were made public.

65.     The Redacted Declarations provided copious facts demonstrating that, unbeknownst to investors, (i) sexual harassment was indeed rampant at Signet, (ii) it pervaded several aspects of female employees' work lives, and (iii) executives at the highest levels of the Company committed acts of sexual harassment against their subordinates. Signet by and large did not contest the veracity of the horrific facts contained in the Declarations during Class Certification in the *Jock* Arbitration. As the Arbitrator explained in the Class Award:

> The conduct described in the declarations . . . includes references to women in sexual and vulgar ways, groping and grabbing women, soliciting sexual relations with women (sometimes as a quid pro quo for employment benefits), and creating an environment at often-mandatory Company events in which women are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected. . . . For the most part Sterling has not sought to refute this evidence; rather Sterling argues that it is inadmissible, irrelevant and insufficient to establish a corporate culture that demeans women.

66.     Later reporting, including an April 2019 expose by the New York Times Magazine would confirm that the behavior described above was pervasive at Signet.

**Sterling Management – Including Executives at the Highest Levels of the Company – Were Known Throughout the Company for Harassing Female Subordinates**

67.     Several Declarants explained that Sterling had a pervasive – and well-known – culture of sexual harassment, flowing from the very top levels of the Company. For example, Anthony Christy, who worked at Sterling for several years during the period from 1997 through 2008, explained about the Company's leadership:

> In general, I would describe the top executives of the Company as being a "'boys' club.'" There was basically a clique at the top of the Company that consisted of the primary male executives. . . . These executives had a reputation at the Company for engaging in intimate sexual relations with subordinate female managers at Sterling.

68.     Sherri Chegini, who worked for Sterling in the early 1990s, and then again from approximately 2000 until 2006, had a similar characterization. She recalled that Sterling managers, including District Managers and higher-level executives, were part of what they called "the 'boy's club,'" which consisted of "male managers who played golf together, went to strip clubs, and made sexual conquests of female associates."

69.     Sadie Cisneros-McMillian, who worked for Sterling from 2003 until 2006, stated that "it was widely known and accepted as part of the Company culture that male management and upper management engaged in sexual harassment of and sleeping around with female employees under them."

70.     Several high-level executives were notorious throughout the Company for being "womanizers" and for routinely sleeping with and sexually harassing female subordinates. As Heather Henry, who worked for Sterling from 1998 until 2005, explained:

> Sexual harassment regularly occurred in Sterling. The Company's top level executives fostered this behavior and this culture of sexual discrimination at the Company because they actively participated in it. For instance, [a certain top-level executive] had a well-known reputation at the Company for being a womanizer who took sexual advantage of lower level-female managers or employees at the Company.

71.     Donna Orosz, who worked at Sterling from 1984 until at least 2009, recalled, of a senior Sterling executive, that "[i]t was known among the managerial ranks that [he] was a womanizer, who used the power and prestige of his high-ranking executive position at Sterling to get subordinate female managers to have sexual affairs with him."

72.     Katherine Christy, who worked for the Company from 1993 until 2006, likewise said, of a "very high ranking executive of the Company," that he "had a reputation at the Company for pursuing and engaging in romantic affairs with subordinate female managers at Sterling. . . . Other Sterling managers told me that [he] had a "list of pretty girls" that he was especially interested in at the Company. . . ." Christy further explained that "It was also common knowledge

at the Company that there were other high-ranking male executives who . . . were also engaged in sexual affairs with female subordinates in the Company . . . ."

73.     Melissa Corey, who worked for Sterling for approximately seven years starting in 2002, mentioned two specific executives who had reputations for being "womanizers." At least one of them was "a high level executive" who had a reputation for "sleeping with female employees."

74.     Mandy Lee Alva, who worked at Sterling in 1996 and then from 1999 until 2007, recalled never wanting to meet a certain "top executive" because he had a reputation "for being a womanizer who slept with subordinate female managers at the Company." She also stated that she was told by one or more of her Store Managers that the executive "would 'do' anything that walked and that female managers needed to be careful about what clothes they wore when they were around him, so as not to provide him with any provocation" to approach them sexually.

75.     Tina Waring, who worked for Sterling from approximately 1999 or 2000 until 2005, stated that she knew that a certain executive "was a high level executive at Sterling." A store manager told her that that high level executive was a "playboy" who "slept around with female Sterling employees."

76.     Julia Highfill, who worked for Sterling from 2002 until 2011, stated:

> During my employment at Sterling, I was aware that sexual harassment of female employees by superior male managers and executives was widespread and prevalent. I was exposed to many examples of this during the nearly nine years I worked for Sterling. The sexual harassment I was aware of occurred throughout the various supervisory ranks of the Company and included some of the Company's highest ranking male executives.

77.     Joseph Kabbas, who worked at Sterling, likewise stated:

> I knew [a certain executive] during my employment at Sterling. He was a high- ranking executive who became Sterling's [Redacted] in approximately 2003. I met [him] many times including at Sterling's Headquarters in [Redacted] Ohio . . . . [He] was an attractive man with a charismatic personality. He also had a very well- known reputation at Sterling for being a womanizer with subordinate

female employees at Sterling. This reputation came to me from other Store Managers and supervisors above the Store Manager level who would regularly discuss [his] womanizing activity.

78.     Later reporting, including an April 2019 expose by the New York Times Magazine would confirm that the behavior described above went to very highest executives at Signet, with the author of the New York Times Magazine piece writing that they believed Defendant Light was often named in the reacted portions of the declarations.

**Sterling Executives Routinely Sexually Harassed Subordinates at Sterling's Annual Managers' Meetings and Other Special Events**

79.     The Declarants also identified scores of instances where Sterling executives – including high-level executives – sexually harassed female subordinates at Sterling's annual Mangers' Meetings and at other special events.

80.     Anthony Christy attended several Managers' Meetings, and explained:

These meetings provided much opportunity for Sterling's male executives and managers to have sexual encounters with subordinate female managers in attendance. Male executives used the power and prestige of being Sterling executives to find and coerce lower-level female employees at Sterling to have sexual relations with them. Based on my personal observations of executive behaviors and from discussions with other Sterling Managers, it was apparent that this inappropriate and warped activity was well- known throughout the Company, and it encouraged lower-level male managers to engage in similar behavior.

81.     Timeen Adair, another former Sterling employee who attended several Managers' Meetings, also observed male executives and District Managers hitting on female subordinates at the events. She explained that "[i]t seemed . . . that at these meetings the men were on the prowl sexually, and the younger the better when it came to the females they pursued."

82.     Chris Jones, who worked at Sterling from 2001 to 2008, explained that:

It was common knowledge at the Company that the Annual Managers' Meeting . . . was a "Sexcapade." That is the term I recall hearing to describe it. There were wide-spread rumors at the

> Company about all the illicit sexual activity at the [events], which is
> why they were referred to as "Sexcapades."

83.   Melissa Corey attended several Managers' Meetings. She stated that the Managers'

Meetings "had a reputation within the company for being a wild event in which male managers,

supervisors, and executives could seek out sexual encounters with subordinate female Store

Managers." She further explained that, at Managers' Meetings, she

> Regularly observed [male executives and District Managers] hitting
> on female Store Managers, buying them drinks, dancing with them
> in a sexually suggestive manner, and otherwise sexually preying on
> them. This was done out in the open, and appeared to be encouraged,
> or at least condoned by the company.

84.   She also called the Managers' Meetings "a sex-fest," explaining that she was

warned to stay away from a hot tub at the resort at which a Managers' Meeting was being held

because "male executives and supervisors had sex with female Store Managers in the hot tub after

hours." She further recalled seeing a high-level Sterling executive regularly staying late at the bars

with a group of attractive female Store Managers and buying alcoholic drinks and shots for the

group, and that she had heard stories about that executive, who had a reputation as a "womanizer,"

being naked in the hot tub with female Store Managers.

85.   Alain Dawn Gough, who worked at Sterling from 1998 until 2005, also described

the Managers' Meetings as a "sex-fest." She recalled witnessing members of upper management

getting drunk with employees, and noted that an executive, "who was at the top of upper

management, had a reputation of being a womanizer of Sterlings' [sic] female employees and was

regularly drunk with a woman by his side." She also recalled hearing "that members of upper

management would invite some of the female Store Managers to join them in their pool area where

they would watch the female Store Managers get even more drunk."

86.   More "colorful" terms were commonly used for the Managers' Meetings as well.

Marsha Davis, who worked for Sterling from 1994 to 2002, stated that at least one Store Manager

who had attended a Managers' Meetings referred to it as a "f*ck fest." She also stated that she

learned about the reputation of Managers' Meetings from Store Managers who had attended them, explaining that "[t]he reputation of the [Managers'] Meeting was one of sexual permissiveness between the male and female managers and executives who attended it."

87.    Stacey Goldberg, who worked at Sterling from 1997 until 2007, also used the same term: she stated that the Managers' Meetings "had a well-deserved reputation of being 'F*ck Fests,' which was a common term at Sterling used to describe them. . . . Sexually promiscuous activity between male executives and managers and subordinate female managers was commonplace."

88.    Diane Acampora, who worked for Sterling from 2002 through 2009, attended several Managers' Meetings. Among other things, Ms. Acampora explained in the Declarations that "[i]t was common knowledge at the Company that these meetings provided abundant opportunity for heavy drinking and extramarital sexual activity between male managers, supervisors, and executives and subordinate female managers." She further explained that she saw a Sterling executive at the Managers' Meetings who "had a well-known reputation at Sterling for being a womanizer including his having sexual relations with subordinate female managers." She also explained that, while attending one of the Managers' Meetings, she was groped and fondled by a Sterling Manager, and that a District Manager attempted to kiss her. She further explained that it was common knowledge that sexual activity between male Sterling managers and their female subordinates occurred during cruises that Sterling held to recognize high-performing employees.

89.    Heather Ballou, who worked for Sterling from 2000 through 2009, also attended several Managers' Meetings. At one, she was propositioned by a Sterling District Manager. She also recounted observing a Sterling executive watching a group of 10 female managers "frolicking" in a pool in various stages of undress at one of the meetings, and, at another, the same executive flirted with her and touched her on the lower back in a way that made her feel uncomfortable and that he was "putting the moves" on her and another Store Manager.

90.     The Class Complaint alleges (on information and belief) that the Sterling executive whom Ballou described and whose name was redacted in Ballou's Declaration was Mark Light, who would later become Signet's CEO. The Redacted Class Certification Brief alleged that "Mr. Light was also observed by multiple witnesses at Company meetings being entertained by female managers, in various states of undress, in a swimming pool and joining them in the pool himself."

91.     Jeanene Glaude worked for Sterling from 1996 until 2002. She recalled seeing a "very high-ranking executive at the company" at the Managers' Meetings, and stated:

> [At the Managers' Meetings] I regularly observed him being very touchy-feely with subordinate females, and flirting with them. For example, he us usually had a crowd of attractive female managers around him, and it was not unusual for him to have his arm around one of them. . . . [He] had a reputation within the company as being a womanizer.

92.     Brad Bartl, who worked for Sterling from 1989 until 2006 and attended Managers' Meetings from 1991 to 2005, explained that "[i]t was . . . common knowledge that many of the male managers and executives in attendance [at the Managers' Meetings] were engaged in extramarital sexual activities with their subordinate female managers."

93.     Donna Bartl, who worked for Sterling from 1999 through 2003, attended the 2002 Mangers' Meeting and observed that "[t]here was a lot of drinking . . . and inappropriate fraternizing between male managers and their female subordinates." She gave the example of observing a Sterling executive inappropriately touching a female subordinate on the buttocks while waiting for dinner with a group of Sterling employees.

94.     Cathy Mantia, who worked for Sterling from 2003 until 2006, attended the 2005 Managers' Meeting. She recalled seeing a District Manager and other executives "dancing with female Managers in a close, sexual manner with their bodies touching those female Managers." She also explained that she "she could not walk around [the event] without a male Manager propositioning [her] for sex." She recounted an episode where an executive had tried to force her to dance with him, and held her with both arms around her when she refused to do so. When several

women intervened and managed to pry the executive's arms from around her so she could escape, he became angry.

95.    Katherine Christy, who worked at Sterling from 1991 until 2006, shared her harrowing experience at the 2003 Managers' Meeting: she was dancing with a male District Manager at a party there when:

> [He] said, "I need some air." He put his hand on my elbow and led me off the dance floor and outside. After we got outside, he suddenly grabbed my arm and dragged me off to the bushes nearby. I was stunned. He reached through the front of my dress and fondled my breasts and kissed me on the mouth. I pushed him off with both hands, and kneed him on his inner thigh. I ran away very upset and crying.

96.    Christy returned to the party, where she learned that the same District Manager had previously been "arrested at the Florida meeting for raping [a female Sterling employee]."

97.    Several other Declarations give similar accounts of Sterling's Managers' Meetings. In total, more than 90 of the Declarations discuss the Managers' Meetings, and the vast majority of those describe a similar atmosphere of sexual predation by Sterling managers and executives on female subordinates.

### Sterling Executives Regularly Harassed Female Subordinates in the Ordinary Course of Business

98.    The Declarations further make clear that sexual harassment of female employees by Sterling executives was not limited to the Managers' Meetings – it was a pervasive feature of the Sterling workplace.

99.    Timeen Adair explained that, on the occasions a certain Sterling executive visited the store where she worked, he "requested attractive female employees go out for drinks and dancing with him the night before he visited the store." She further explained that the District Manager would call in advance of these visits with a list of women for the executive to party with. She stated, "It was apparent to me that [the executive] was arranging these evenings to find

someone to hook up with sexually," and explained that, although the female employees did not want to go, they felt obligated to do so. She also recounted hearing stories of women going up to the executive's room at the hotel and hearing about a time when a colleague had to get a female employee out of the executive's bathroom after the female employee locked herself in there when she became scared by the executive's behavior.

100.    Heather Ballou also experienced sexual harassment while working at Sterling. She explained that a District Manager "would come up and wrap his arms around me, and I would have to pull away. [The District Manager] told me not to tell his fiancée, who also worked for Sterling in the district." On another occasion, Ballou said, the same District Manager "grabbed my butt in a sexual way." Ballou also described a situation where a District Manager sexually assaulted Ballou's coworker: although the District Manager apologized the next day," he "also said he could get away with just about anything, like it was a joke." Ballou and her coworker did not report the assault because they were afraid of retaliation. Ballou also stated that it was "common knowledge in the store that [the District Manager] had several sexual harassment complaints from female employees against him [but] he was not fired for sexual harassment until years later."

101.    Anna Battaglia-Laglante worked at Sterling from 2005 until 2006. While there, she observed and experienced "inappropriate behavior and sexual harassment by male upper management"; she stated, for example, that a District Manager would "look me and the other female Sales Associates with whom I worked up and down, stare at our breasts and rear ends, get very close in our personal space, and even reach into our shirts to stick tags back in." She never complained about his behavior because she and her coworkers "were . . . afraid of him. He was our District Manager, and we felt our jobs were in his hands."

102.    Sherri Chegini recalled that two different Store Managers she worked for were both having affairs with their District Managers.

103.    Anthony Christy likewise stated, "I was told by a young female front office employee at [a] Kay store that [the District Manager] had made sexual advances toward her. She

was approximately 19 or 20 years old at the time . . . . [The District Manager] was viewed by his employees as a sexual predator."

104.    Katherine Christy also experienced sexual harassment from her District Manager. She explained that her District Manager "often made inappropriate sexual comments to me that made me uncomfortable. He made comments about my breasts and legs." She recalled one incident in which they were sitting on a couch and he said to her, "'Oh my god. Looking at your legs makes me hard. We have to get up and walk around.'"

### Sterling Executives Regularly Conditioned Employment Decisions Concerning Female Employees On Whether Or Not Those Employees Acceded To Sexual Demands

105.    The Declarations demonstrate that female employees at Sterling were routinely pressured into sexual activity with their superiors in exchange for better economic opportunities at the Company, including preferred store assignments and promotions, as well as to protect themselves from adverse employment decisions.

106.    Amanda Barger, who worked for Sterling on and off from 2005 until 2010, explained that, when she expressed interest in a promotion to a District Manager, he invited her to a management meeting in Georgia. While at the meeting, he sent her a sexually explicit text. When she reported the sexual harassment, Human Resources employees accused her of having a relationship with the District Manager but told her that "she would not have to be worried about [her] job" if she "cooperated."

107.    Mary Casillo, who worked at Sterling from 2003 until 2010, explained that "Sexual harassment is prevalent at Sterling." She recalled a situation where a female Assistant General Store Manager was passed over for promotion to General Manager in favor of a female sales person "who was rumored to have been performing sexual favors for the District Manager." After that sales person was promoted to Store Manager, another employee walked in on her and the District Manager "engaged in sexual behavior in the stockroom."

108.    Ellen Contaldi worked for Sterling from 1994 until 2008. As she explained in her

Declaration:

> Employees typically found out about promotion opportunities at
> Sterling through word-of-mouth. Advancement at Sterling was very
> dependent on who you were connected to at the Company. If you
> were connected to, meaning you had a relationship with, someone
> in upper management you were more likely to advance into
> management and receive perks. At Sterling it was common for
> female employees to exchange sexual favors for non-sexual favors
> with their male superiors, and when a female employee was
> promoted employees typically speculated "I wonder who she knew
> and who she blew," meaning that if a female employee obtained a
> promotion it was highly probable that she had an intimate
> relationship with a male superior.

109.    Contaldi further explained:

> I knew from speaking with other female Store Managers that a way
> to ensure advancement at Sterling was to establish a sexual
> relationship with a male Executive. In approximately 2000, I began
> a sexual relationship with [an executive]. . . . When my relationship
> with [the executive] turned sexual, he transferred me almost
> immediately to a more desirable, high-volume store and I received
> a pay increase. Before my relationship with [him] I was placed in
> less desirable, low-volume Stores. He also started to groom me for
> advancement into management.

110.    Other employees' Declarations confirm that female employees were vulnerable to

predation by male executives in exchange for career advancement and job security. Alaine Dawn

Gough explained that a certain District Manager "had many affairs with Store Managers. It was

well known among the Store Managers that if [he] slept with a Store Manager, he looked out for

her better interest." Gough recounted a situation where a certain Sales Manager was caught

"performing oral sex on" a District Manager, who later "turned a blind eye" to the Store Manager's

declining sales; she was not written up or demoted, and nothing was entered into her file. In fact,

she was promoted.

111.    Jeanene Glaude likewise explained:

> [A very high-ranking executive] had a reputation within the company as being a womanizer. I heard this from other Store Managers and District Managers. It was believed within the company that sleeping with [Redacted] was a way for women to advance within the company. For example, [Redacted] was a young, attractive female employee who came to Sterling from Starbucks. She moved up in the company very quickly, and was promoted to Store Manager at the Kay store in California, at the [Redacted]. Sterling managers talked about how she gained quick advancement by being one of [the executive's] favorites, and by sleeping with him.

112.    Heather Ballou told of two situations where District Managers suggested that she could advance her career by acceding to sexual demands. When she expressed interest in being promoted to the same District Manager who hugged and grabbed her as described above, he "tried to get me to go out and discuss it with him over dinner and drinks, in a manner that appeared inappropriate to me." At the 2005 Managers' Meeting, Ballou, then a Store Manager in Florida, was propositioned by a District Manager. She stated in her Declaration that the District Manager "told me that if I had sex with him, then he would make sure that I would be transferred back to the [redacted], Florida area whenever I wanted to make that move. From conversation with me, he knew that was something I was going to be interested in doing in the future." Ballou acceded to the District Manager's demand, and, when she sought to transfer a few years later, the District Manager made the transfer happen.

113.    Cathy Mantia was also propositioned by a superior in connection with a potential promotion. Mantia explained that, when she was interested in being promoted to Store Manager, a District Manager asked her "'what incentives' I was prepared to do for him in exchange for a promotion to Store Manager." Mantia further explained, "I felt cornered, afraid, and angry that [the District Manager] was propositioning me for sex in exchange for a promotion to Store Manager." She further stated that the District Manager propositioned her on at least four other occasions, and that she was initially afraid to report him. Also, as discussed above, Mantia was subjected to sexual harassment at a Managers' Meeting, when a District Manager tried to force her to dance with him and became angry when she escaped with the help of friends. She was fired

soon after. A few weeks later, she called the District Manager to discuss her termination and the sexual harassment incident. The District Manager "confirmed that he was the person who dealt with termination issues," and became "hostile" and stonewalled Mantia when he learned about her reason for calling, saying that she "'[would] not win a sexual harassment or wrongful termination case against Sterling.'"

114.    Female employees who refused to accede to their superiors' sexual demands risked being frozen out of opportunities for advancement at Sterling. For example, Jessica Delorey repeatedly refused the advances of the District Manager for whom she worked. As she explained in her Declaration:

> At the time, I was a single mom and could not afford to lose my job. [The District Manager] knew this and preyed upon my vulnerability. However, I refused to succumb to his advances and requests for sexual favors and as a result, [he] refused to aid in my obtaining a raise or promotion to assistant management. I am not aware of females being promoted on merit by [the District Manager]. Based on my experience, the only way to be promoted as a female at Sterling under [him] was to perform sexual favors.

115.    Delorey further noted that female employees who had affairs with this particular District Manager received promotions shortly thereafter.

116.    Alain Dawn Gough recounted a similar example in which a female employee was pressured into sexual acts with a Sterling executive in order to keep her job.

> [M]ale District Managers were often predatory and sought out subordinate female employees to prey on. For example, in 1999, [a female store manager] told me that she contacted [a District Manager] because her store had an inventory problem and she was worried she would be fired. She told me that she agreed to have sexual relations with [the District Manager] in exchange for keeping her job. This Store Manager also described to me in detail their sexual encounter . . . . This Store Manager was not fired.

117.    Stacey Goldberg had a similar experience. She explained that a Sterling executive who would periodically visit her store "began to sexually proposition me" once they had become

acquainted. She explained that the executive "was very persistent in his pursuit of me," and that, after he continued to persist even though she rebuffed his advances, "I began to think my job security might be in jeopardy if I did not succumb to his pressure. I eventually felt I had no other option." This also happened to Goldberg with her District Manager: although she felt it was inappropriate and against Sterling's official policies, "due to my concern about my job security and [the District Manager's] pressure, as my direct and immediate supervisor, I felt I had no option but to succumb to his demands."

118.    Heather Henry also experienced the pressure to engage in sexual acts to advance her career. She explained that, when she sought a Store Manager position, a District Manager told her he could get her a job, and, "[b]ased on his reactions and what he said on the phone about helping me get [the job], it was clear to me that he would expect me to succumb to him sexually if I decided to accept this offer." Henry decided not to accept the job, and was terminated shortly thereafter.

### Sterling Repeatedly Failed To Respond To Sexual Harassment Allegations and To Protect Female Employees Who Complained Of Sexual Harassment from Retaliation

119.    The Declarations also make clear that Sterling's responses to allegations of sexual harassment at the company were grossly inadequate, and that they failed to protect employees who reported harassment from retaliation by their harassers or the Company.

120.    Sterling utilized a hotline, called "TIPS," for employees to report matters including sexual harassment. As many employees discovered, complaints raised via the TIPS hotline were routinely ignored or swept under the rug by the Company. Even worse, although the TIPS system was held out to employees as being anonymous, it was not, as many employees discovered: employees who reported sexual harassment were routinely outed to their harassers and subjected to retaliation for making complaints.

121.    For example, Jasmina Hadzialic explained in her Declaration that a male superior sent her "numerous text messages with pictures of his penis" and propositioned her with extremely

crude language, saying "'I want to bend you over the case and f*ck the sh*t out of you.'" Although

she reported this to her District Manager, nothing was done for three months, during which time

the harassment continued. When Sterling did finally act, it transferred Hadzialic. She explained

that she was not aware of her harasser being reprimanded; in fact, Sterling subsequently promoted

him twice.

122.   As Julia Highfill explained in her Declaration:

> Sterling did not have an effective or serious mechanism by which
> female employees could complain about their mistreatment. Many
> employees were afraid to call the supposed anonymous complaint
> TIPS line because it was not confidential or anonymous. In
> approximately 2003, I called the TIPS line to put in a complaint
> regarding [a District Manager]. [He] was scheduled to visit my store
> but he didn't show up until 30 minutes before closing. When [he]
> did show up it was clear that he was drunk; he was giddy and reeked
> of alcohol. After I called the TIPS line to complain about this
> incident, [the District Manager] called me back soon after I called
> and told me that I shouldn't have made a complaint against him. He
> confirmed that the TIPS office had notified him of my "confidential"
> complaint. He warned me if I called again, he would immediately
> find out about it. I was hesitant to call the TIPS line after that
> because I was afraid of retaliation. This was true throughout my
> employment with Sterling . . . .

123.   Many employees who knew about the lack of anonymity of the TIPS hotline were

scared out of using it at all. After Jessica Delorey was sexually harassed by a District Manager, a

colleague told the District Manager that Delorey was going to call the TIPS hotline.

> [The District Manager] then called the store and asked for me and
> demanded that I step outside and call him back on my cell phone
> and not on the store's phone. When I called him back, he was furious
> and threatened to fire me if I called TIPS. He stated, "If you
> complain, I will take you out." He also made clear to me that he
> would be informed if I called TIPS . . . . There was no one I could
> complain to at Sterling who had the power to stop the sexual
> harassment I was facing. I knew the TIPS tine would not be
> confidential because [the District Manager] clearly stated it was not
> and I learned through personal experience that it was not. I believe
> the fact that Sterling has no policy or procedure in place to allow
> employees to confidentially report sexual harassment without the

fear of losing their jobs only allows for more sexual harassment to take place.

124.    Amy Anderson, who worked for Sterling from 1984 until 1991 and again from 1998 until at least 2009, shared a story and explained that she did not believe that the TIPS hotline was truly anonymous:

> Employees at Sterling are encouraged to use an anonymous "TIPS" system to report instances of sexual harassment. This system utilizes a toll-free number that supposedly reaches someone in the H.R. department, who is then supposed to conduct an investigation. Although it is widely advertised that calls to the "TIPS" line are anonymous, this is not actually the case.
>
> I am aware of a part-time Sales Associate who called in a complaint to the TIPS line about a Store Manager, in 1999 or 2000. Shortly after the complaint was lodged, my Store Assistant Manager . . . told me that she and the District Manager were aware of the name of the person who made the complaint . . . . I no longer have faith that if I need to make a complaint in the future, that it will be anonymous, as advertised. I probably would not be comfortable making a complaint, if the need ever arose, knowing that the subject of the complaint may discover my identity and be free to confront me or retaliate against me.

125.    Wendy Avila, who worked for Sterling from 2002 until 2008, shared a similar story:

> During my employment, I observed that calls to Sterling's supposedly confidential complaint hotline, TIPS, were not in fact confidential. It was well known in the district that [the District Manager] found out the identity of those employees who utilized the TIPS line to make complaints. In 2005 or 2006, I learned from [a female employee] that [the District Manager] had told her that [the District Manager] had listened to the recording of an employee's call to the TIPS line. [The District Manager] said she was able to identify the employee's identify from her voice and accent.
>
> Because [the District Manager] was able to learn the identity of employees who utilized the TIPS line, it impacted whether employees would use it to bring complaints to the company's attention. For example, in 2007 or 2008, [a female employee] came to me about an offensive remark that [the District Manager] had made comparing gas prices to rape. I counseled [the female employee] not to call the TIPS line because [the District Manager]

would find out that she had made the complaint and possibly retaliate against her for that.

126.    Christine Ferreri, who worked for Sterling from 2002 until 2009, explained that, when she reported harassment by a male coworker, Sterling asked her District Manager "if I was a 'troublemaker. . . . Retaliation was widely feared at Sterling, and this comment confirmed those fears for me."

127.    Teri Flippin, who worked for Sterling from 2003 until at least 2013, likewise stated that she had been dissuaded from reporting inappropriate sexual activity between a Store Manager and an employee "because I have heard other Sales Associates say that complaints to TIPS are not confidential and are usually not addressed or resolved by Sterling."

128.    Lisa Jackson, who worked at Sterling from 2001 to 2003 and then from 2006 until at least 2012, shared her story of intimidation in her Declaration: in the fall of 2010, she was interviewed by Human Resources regarding a complaint that had been made about a male superior who had previously warned her that, if she "complained about him to HR, he would find out about it and that it would not be good for" her. As she explained:

> Sure enough, within a few minutes after I hung up the phone with [Human Resources], [the male superior] called me and in a threatening manner asked me how my call with [Human Resources] had gone. He told me that I should have called him to report the details of the call.

129.    Joy Lamb, who worked for Sterling from 2004 until 2011, shared her story of Signet's failure to take seriously complaints of sexual harassment:

> Sterling's attitude about female employees is also evident in the way that it handles complaints of sexual harassment. Inappropriate behavior by Store Manager [Redacted] was a frequent topic of conversation in the [Redacted] Jared. Stories about him getting too close in the supply room, making inappropriate comments or having lunches with young female subordinates were constantly heard in the store. I regularly saw young female employees actually crying about his inappropriate behavior. I know some people reported this behavior on the TIPS line, but am not aware of any action or investigation taking place as a result of that. In fact, after

complaints were made about his sexual harassment, [the Store Manager] was actually promoted to a position in another state.

130.    Cathy Mantia also suffered indifference regarding her sexual harassment complaints. As discussed above, Mantia explained that she was initially afraid to report her District Manager who offered her a promotion in exchange for sexual activity, but once she transferred to a different district she attempted to file a harassment complaint on at least two occasions. As Mantia stated:

> Each time I asked Human Resources if I could speak with someone regarding sexual harassment that I had experienced, Human Resources refused to listen to me. I was told by Human Resources that my sexual harassment issue could not be addressed at that time but someone would contact me at a later date. No one from Human Resources ever followed up with me to discuss filing a sexual harassment complaint.

131.    Adawie Mais Tarrab explained that, in her experience, "Sterling would transfer females who complained of sexual harassment rather than discipline or demote the harasser."

132.    Vanessa White, who worked at Sterling from 1999 until 2010, shared her experience with a Store Manager who routinely touched without permission and made inappropriate, sexual comments to female employees. White explained that when complaints were launched via the TIPS hotline, Signet "would investigate by calling complainants in the store where they worked – often alongside the accused party." This allowed the Store Manager to identify the women who made complaints, thus deterring others from doing so in the future. And, in any event, White was unaware of any action taken against the Store Manager despite numerous complaints; in fact, he was subsequently transferred to a higher-volume, more lucrative store.

133.    Joretta Whyde, who worked for the Company from 2003 until 2005 and again in 2007, also experienced Sterling's indifference to sexual harassment complaints. Whyde's Store Manager repeatedly touched her without permission and made inappropriate comments. As Whyde explained, when she complained about the sexual harassment to her District Manager, "he shrugged off my complaint by saying 'That's just [Store Manager].'" Whyde noted that the Store

Manager <u>had been previously fired by Sterling for sexual harassment</u>, and stated, "[t]he fact that the company had rehired a sexual harasser, and then a District Manager shrugged off complaints about his behavior, made me realize that it was futile to complain about sexual harassment to this company." Later, when Whyde was working at a different store and was harassed by a Sterling Sales Associate, she complained to her Store Manager; her complaint was again brushed off, and shortly thereafter her hours started being reduced.

134.    Lindsay Zalanka, who worked for Sterling during the time period from 2003 through 2005, was also the victim of sexual harassment and retaliation for reporting it. Zalanka was groped against her will by a coworker, and then pressured not to bring a complaint with the Company because her Store Manager "felt this would attract negative attention to our store." Zalanka explained:

135.    There was a lot of pressure on me not to say anything. . . . I also got the sense that Sterling management had encouraged [the Store Manager] to dissuade women from reporting incidents of sexual harassment. This gave me the sense that this kind of incident had been ignored by Sterling in the past.

136.    Zalanka further explained that, when she eventually did complain, she was retaliated against. She worked temporarily on a sporadic, part-time basis during 2005, and when she sought full-time employment again she was told that "Sterling's corporate officers refused" to give her old position back. "When I asked why, [the Store Manager] refused to give me an answer. I had consistently high standards and a high sales record, so I believe that Sterling was only refusing to reinstate me in retaliation for having filed a complaint of sexual harassment."

### Sterling Repeatedly Attempted To Intimidate Employees into Silence in the Context of the Actions

137.    Several Declarants testified that they were intimidated into signing declarations for Sterling in the *Jock* Actions that were materially inaccurate. For example, Christine Ferreri, who worked for Sterling from 2002 until 2009, explained that, on April 5, 2006, she was interviewed

by an attorney for Sterling in a vacant store front at the mall at which she worked. Ferreri further explained:

> I was very concerned about my job security when answering questions from Sterling's attorney and felt compelled to participate in the interview. . . . At the end of the interview, Sterling's attorney handed me a statement to sign. I did not feel like I had a choice other than to sign the statement because I was concerned about losing my job if I did not.

138.    Susan Crump, who worked for Sterling from 2005 until at least 2009 and who was a claimant in the *Jock* Arbitration from 2008 onwards, recounted her experience being interviewed in connection with the *Jock* Actions. Crump explained that, on October 10, 2005, Sterling's HR Manager, Mary Ellen Mennett, and Sterling's outside counsel, Jacqueline Kalk, arrived at the store at which Crump worked, unannounced, to conduct interviews. Crump was interviewed last, at approximately 8:30 p.m., after a full day of work. One of Crump's co-workers was fired during his interview. Mennett told Crump at the start of her interview that she would be terminated if she did not cooperate. Crump explained:

> It was very intimidating and scary to have my job threatened like this. It was my only means of income – my livelihood, and I also had aspirations to be promoted to Assistant Manager and then Store Manager. I was not offered to have a lawyer of my own present, nor was I told that I did not have to speak with Sterling's HR manager or its outside attorney. I felt very scared, intimidated, and threatened.
>
> * * *
>
> [A]bsent from the declaration Mennett and Kalk gave me to sign was information I had provided them regarding sexual harassment and inappropriate behavior by male Sterling employees against female Sterling employees that I had witnessed on the job. . . . In addition, during the interview, I was asked if I agreed with the women who were bringing the case against Sterling that Sterling was discriminating against its female employees in pay and promotions based on their gender, and I said, "yes." However, Kalk and Mennett did not include this statement, or any of the information I provided regarding sexual harassment and inappropriate behavior, in the declaration they gave me to sign at the conclusion of my interview.

36

* * *

Because of what Mennen told me, I understood that if I did not
cooperate in the interview and sign the declaration at the end of the
"interview," that I would be terminated.

I signed the statement and was not given a copy. I felt so pressured
to keep my job that I did not even feel comfortable asking for a copy.
This was one of the most emotionally and psychologically grueling
hours of my life.

139.    Anna Melton, who worked for Sterling from 2002 until 2006, was also interviewed
by an attorney for Sterling in connection with the *Jock* Actions, though Melton was misled into
thinking that the interview was in connection with a proactive investigation into timekeeping
practices conducted by Sterling after Zales had been sued for issues related to overtime
compensation. Melton's interview was conducted in March 2006. She stated, "I was very
intimidated by having to speak with an attorney for Sterling and was fearful that I would lose my
job if I did not cooperate with the attorney." Melton explained that the attorney did not ask
questions about gender discrimination issues. Melton signed the declaration the attorney drafted
without reading it. Years later, she was dismayed to find that it contained assertions concerning
fairness in pay and promotion, including "I believe my pay rates have been set fairly and without
regard to gender," and "[g]ender is not a factor in making promotion decisions, instead, all
promotions are awarded to the most qualified applicant," which Melton did not believe at the time
the interview was conducted.

140.    Adawie Mais Tarrab was also intimidated into signing a declaration containing
untrue statements. Tarrab explained that she "did not voluntarily provide [her initial statement]. I
was told by [a Store Manager] that I was required to participate in the interview." Tarrab explained
that the way in which Sterling conducted the interviews made her believe that she had no choice
by to agree to whatever Sterling's attorneys prepared for her to sign:

I was intimidated, afraid to refuse to participate in the interview and
feared retaliation if I refused to sign the statement or disagreed with
its contents. I felt that I had been summoned to the interview

specifically "to agree" and that the process was being conducted for the benefit of Sterling, to protect it from some legal trouble.

\* \* \*

Because I am no longer employed by Sterling or dependent upon Sterling for my livelihood, I no longer feel afraid to acknowledge experiences I had during my employment, which demonstrated to me that Sterling did in fact make promotion decisions in favor of males based upon gender and that Sterling would transfer females who complained of sexual harassment rather than discipline or demote the harasser.

### **The Truth Emerges**

141.    After market close on Monday, February 27, 2017, *The Washington Post* published a blockbuster article entitled "Hundreds allege sex harassment, discrimination at Kay and Jared jewelry company" (the "Washington Post Article"). The Washington Post Article quoted several of the 250 Redacted Declarations from the *Jock* action, and summarized others. It also included interviews with several of the Declarants. The Washington Post Article focused directly on Signet's pervasive culture of sexual harassment, reaching all the way up to the highest levels of the Company:

> Hundreds of former employees of Sterling Jewelers, the multibillion-dollar conglomerate behind Jared the Galleria of Jewelry and Kay Jewelers, claim that its chief executive and other company leaders presided over a corporate culture that fostered rampant sexual harassment and discrimination, according to arbitration documents obtained by The Washington Post.
>
> Declarations from roughly 250 women and men who worked at Sterling, filed as part of a private class-action arbitration case, allege that female employees at the company throughout the late 1990s and 2000s were routinely groped, demeaned and urged to sexually cater to their bosses to stay employed. Sterling disputes the allegations.

142.    The article also explained that journalists and Cohen Milstein had sought to make the Declarations public over a year earlier, but that Signet had resisted, and had only recently

agreed to the publication of the materials – and only after approving redactions that obscured harassers' identities:

> Most of the sworn statements were written years ago, but the employees' attorneys were only granted permission to release them publicly Sunday evening. One of the original women who brought the case, those lawyers said, died in 2014 as proceedings crawled on without resolution.
>
> * * *
>
> Since 2015, The Post has requested to review the employee statements submitted as part of arbitration, all of which were designated as confidential. Employees' attorneys have also sought to make them publicly available. Attorneys for the employees and the company recently reached an agreement that the documents could be made public on the condition that they not identify any of the individuals to whom conduct was attributed.
>
> More than 1,300 pages of sworn statements were released Sunday and feature company-approved redactions that obscure the names of managers and executives accused of harassment or abuse.

143.   The interviews in the Washington Post Article were particularly saddening. Heather Ballou explained in her interview that, when her District Manager promised to help her get a store transfer she wanted if she had sex with him, she did so because she believed she was "'backed into a corner' and had no other way to advance." The Washington Post Article further quoted Ballou: "'Looking back, I can't believe some of the things I had to do,' Ballou told The Post, adding that in the moment she thought: 'You suck it up and do what you have to do for your family. You need this job.'"

144.   The Washington Post Article pulled together facts multiple sources, and from interviews, which provided the market with a new and much more complete picture of sexual harassment at Sterling. For example, the Washington Post Article highlighted new facts substantiating earlier allegations against Defendant Light:

> One night, Ballou told The Post, she saw a top executive watching as female managers in varying stages of undress splashed in a hotel pool. "He had a drink in one hand and a cigar in the other, just taking

it all in, like, 'I am the king and this is my harem,'" she told The Post. She was prevented by her attorneys from naming which executive was involved, because of the condition of the arbitration documents' release. The 2013 class-action motion states Light took part in a pool- related incident similar to the one Ballou described.

145.    The revelations in the Redacted Declarations and the Washington Post Article stunned the market, and its reaction the following day was severe. Signet stock closed at $72.88 per share on February 27, 2017. It opened on February 28 at $68.90, and, by 11:22 a.m. that day, it was down to $66.89, 8.3% off the previous day's close.

146.    At 11:22 a.m. on February 28, the Company halted trading pending a release of news. Half an hour later, at 11:52 a.m., Signet issued a press release denying the allegations in the Washington Post Article, which it characterized as "misleading" and "distorted and inaccurate." Signet further argued, among other things, that the *Jock* Actions had never included sexual harassment claims, that the claims "involve a very small number of individuals," that Signet "takes any concerns seriously and had – and continues to have – multiple processes in place to receive and investigate allegations of misconduct," and that the Company had "thoroughly investigated the allegations and [] concluded they [were] not substantiated by the facts and certainly [did] not reflect [Signet's] culture."

147.    The market – newly educated by the Redacted Declarations and the Washington Post Article – was not reassured: when trading resumed, losses continued to mount. By day's end, Signet was trading at $63.59, down from the previous day's close of $72.88 by $9.29 per share, or 13%, on extraordinary volume of 11,317,100 shares.

148.    The revelations in the Redacted Declarations and the Washington Post Article swept through the media. Signet's hometown newspaper, the *Akron Beacon Journal*, published an article on March 1, 2017, detailing the allegations in the Redacted Declarations and the Washington Post Article and linking readers to both sets of documents.

149.    Several other articles, also published on March 1, reported on the revelations. For example, an article entitled "5 Things We Learned About Sexual Harassment Discrimination

Claims Against Kay Jewelers, Jared," published by *Consumerist*, recounted details of several revelations contained in the Redacted Declarations and the Washington Post Article, including (i) events occurring at the Managers' Meetings, (ii) the conditioning of employment decisions on female employees' acquiescing to sexual demands of superiors, and (iii) retaliation against employees who reported harassment to the TIPS hotline. Similarly, a March 1 article published in the *Detroit Free Press* explained that "[d]eclarations by nearly 250 women and men describe [Sterling] as a hotbed of sexual harassment where senior men groped, demeaned and demanded sex of young saleswomen in return for better jobs and job security . . . ." A *New York Times* article published the same day explained that one of the Declarants "did not know much about the experiences of other women at [Signet]. As it turns out, [she] was one of hundreds of former Sterling employees who described a corporate culture polluted by sexual aggression, gender discrimination and abuses of power, according to newly released documents . . . ." And a March 1, 2017 article in *USA Today* explained that "[t]he declarations, obtained by the Washington Post, depict Sterling Jewelers as fostering a workplace where senior men treated young saleswomen as their private harems, including groping, demeaning and demanding sex in return for better jobs and job security, the Post reported."

150.   S&P Capital IQ issued a report on March 2, 2017, in which it lowered its opinion on Signet from "Buy" to "Hold" and lowered its 12-month target for Signet shares by $20, from $105 to $85, citing the recent revelations:

> We think a Washington Post report bringing public a 2008 class action arbitration allegation of gender discrimination and harassment at SIG's Sterling Jewelers operations will weigh on the shares. SIG disputes the reports as portrayed in the media, but we think the exposure will hurt sales regardless.

151.   Analysts and media sources generally connected Signet's stock decline to the revelation of the concealed information about Signet's sexual harassment problem.  For example, a February 28, 2017, piece by Bloomberg News observed "Signet Jewelers Ltd. suffered its worst stock decline in eight years following claims of gender discrimination and sexual harassment at

the jewelry chain, including allegations that involved Chief Executive Officer Mark Light." An article by the Financial Times published in early March 2017 stated Signet's stock drop of nearly 13% on February 28, 2017, was "its biggest one-day drop in 8 years – after the Washington Post reported that former employees of Sterling Jewelers filed a private class-action arbitration case alleging discrimination, among other claims."

152.    Signet scrambled to deal with the repercussions of the release of the Redacted Declarations and the Washington Post Article in late February 2017, and soon proposed dramatic reforms. On March 9, 2017, Signet hosted its fourth-quarter 2017 earnings call. Todd Stitzer, the Chairman of the Board, started the call by speaking at length concerning the recent revelations. After rehashing several of Signet's previous denials of the validity of the *Jock* Actions, Stitzer announced that Signet was undertaking three new initiatives "to assure ourselves, our shareholders, and our team members that our policies and practices are functioning as intended, and to identify areas where we can further improve." First, the Board would form a new committee, comprised of all of the Company's female directors, and focused on "respect in the workplace," and specifically on "programs and policies to support the advancement and development of [Signet's] female team members." Second, the new committee would appoint an independent consultant to conduct a "thorough review" covering the Company's current and future policies and practices regarding, among other things, training, reporting, investigation, and non-retaliation in the context of sexual harassment. Stitzer explained the purpose of the independent consultant: "[W]e want to be sure that the framework we have in place for reporting and responding to [discrimination and harassment] is robust and effective." Finally, the new committee would establish an ombudsperson office to provide confidential advice to employees, address their concerns regarding issues in the workplace, and to provide them with strategies and options to help resolve workplace concerns.

153.    Stitzer also explained that the Board had been briefed on the litigation for years and, when considering Defendant Light for promotions had reviewed available information concerning the harassment:

> As a Board, we have been briefed on this litigation since 2008. As noted earlier, many of the allegations publicized in connection with the case go back decades. When evaluating whether to make Mark Chief Operating Officer in 2014, we obviously reviewed his business performance and evaluated, with advice from counsel, the allegations that were described in connection with the case, reviewed the available information, the timeframes involved, and the context in which it was offered. Based on our review and evaluation, we appointed Mark as COO. When the previous CEO departed the Company, we conducted a further confirmatory review, and Mark was appointed CEO.

154.   On March 7th, 10th, 13th (the next trading day), and 14th, Signet's stock price declined.

155.   On information and belief, Signet's stock declines on these dates were, at least in part, reactions to information leaking into the market regarding Signet's sexual harassment culture. In particular, in light of the Washington Post article in late February, and given Signet's March 9, 2019 announcement of extensive measures in response (despite Signet's denials of a cultural problem), media sources and analysts took notice.

156.   On March 7th, 2017, there was additional coverage of the sexual harassment claims against Signet, including in media sources ValueWalk and theflyonthewall.com, continued to spread and all context to the information released by the Washington Post article.

157.   On March 10, 2017, analyst downgrades of Signet stock occurred; the average analyst price target for Signet stock fell 4%. Also on March 10, the Chicago Tribune published an article reviewing the claims against Signet and the Company's response, including that in its response Signet did not "respond to or rebut" the specific allegations in the Post article. On March 11, 2017, over the weekend, Business Insider published an article on Signet and the sexual harassment issues at the company. News regarding the sexual harassment issues at Signet dominated the news about the Company during this period.

158.   On or about March 16, 2017, Scopia entirely exited its Signet common stock position.

## POST-RELEVANT PERIOD ALLEGATIONS

159.    Approximately one month after the revelations above and the accompanying stock price declines, Signet issued a completely revamped Code of Conduct, the first such overhaul of the document since it was issued in 2009. For the first time, the Code of Conduct began with a letter, which was signed by Defendant Light. In that letter, Light explicitly connected compliance with ethical principles to earning and keeping customer trust and to the success of the business more generally (bold and all caps in original):

> Our Core Values require not only compliance with law but also ethical conduct. We have refreshed our existing codes across all locations and brands to reflect an enhanced One Signet Code of Conduct ("Code").

> Through ethical behavior and commitment to a high standard of integrity, we earn and keep the trust of our Customers who turn to us to help them **CELEBRATE LIFE AND EXPRESS LOVE**. Without the trust of our Customers, our Company will not achieve its mission. You have the power not to allow anything to compromise your commitment to Signet Jewelers' Core Values as well as your own values.

160.    The Code of Conduct also included multiple reassurances to employees that any complaints would be handled anonymously, and specifically included a direction to Sterling managers to "[n]ever retaliate against a[n employee] who raises an issue or concern."

161.    On June 2, 2017, Bryan Morgan, Signet's COO, resigned due to "violations of company policy unrelated to financial matters," and the Company provided no further detail.

162.    On July 17, 2017, Signet issued a press release announcing that Defendant Light was unexpectedly retiring. The press release came as a surprise to investors who noted Light's three-plus decades with the Company, and provided very little explanation of the organizational change, with Light stating only that "[g]iven the Company's positive direction and my need to address some health issues, the Board and I agreed that it is a good time for a transition."

163.    On July 17, 2017, the Wall Street Journal reported that Light "decided to retire for health reasons," but that Signet "[o]fficials declined to disclose the condition prompting Mr. Light to leave the company he has been a part of for 35 years." Several news sources connected his

departure to the sexual harassment allegations revealed in the Redacted Declarations and the Washington Post Article. For example, in an article published on July 17, 2017 entitled "Signet Jewelers CEO Hit By Sexual Harassment Controversy Leaving Company," Fortune.com reported:

> The Signet Jewelers CEO who faced allegations of misconduct during the retailer's ongoing sexual harassment controversy is leaving the company, citing health reasons.
>
> Mark Light, who became chief executive of the largest U.S. jewelry retailer in late 2014, will be replaced by a longtime Proctor & Gamble executive and current Signet director Virginia Drosos on August 1, the company said on Monday. She'll face the daunting task of getting the company, which operates the Kay, Jared, and Zales stores in the United States, along with British chains, back on track saleswise and past a series of damaging hits to its reputation in the last year.
>
> Those have included allegations of gem swapping at its Kay Jewelers stores and a devastating Washington Post story earlier this year alleging years of systemic, mass sexual harassment, charges Signet has repeatedly and adamantly denied. The Post story said among other things that Light was alleged to have been seen in a pool with "nude and partially undressed female employees."

164.    The Washington Post also made the connection, discussing the sexual harassment allegations in detail along with Light's resignation, under the headline "Signet Jewelers CEO, at center of gender-discrimination case, retires for 'health reasons'".

165.    Similarly, in another article published on the same day entitled "Signet Jewelers' New CEO Has Her Work Cut Out for Her," the *Bloomberg Gadfly* explained:

> Signet Jewelers Ltd., the corporate parent of Kay Jewelers and Zales, has lost much of its sparkle in the past couple of years.
>
> The company on Monday took an important step toward reclaiming it: naming a new CEO, Virginia C. Drosos. She will replace Mark Light, who had held the top job since 2014, but whose career at Signet spanned more than 35 years. The company said Light is retiring "due to health reasons."
>
> The change is a potentially pivotal shake-up for a company that badly needs one.

* * *

[S]worn statements in an arbitration case released earlier this year show Light has been accused of inappropriate sexual behavior toward female employees. This claim was unearthed in a class-action case in which hundreds of former workers said there was a pattern of sexual misconduct at the company. (Signet has denied wrongdoing.)

Replacing Light is an effective way for Signet to show employees and investors it wants to move forward and is serious about fixing a troubling workplace culture.

It's also an opportunity to bring fresh eyes to a business that clearly needs new direction.

166.    On December 6, 2017, Representative Cheri Bustos – joined by a bipartisan group of legislators including Senator Kirsten Gillibrand, Senator Lindsey Graham, Representative Pramila Jayapal, Representative Elise Stefanik, and Representative Walter Jones– introduced legislation entitled the "Ending Forced Arbitration of Sexual Harassment Act." The bill would ban mandatory arbitration of sexual harassment claims. Representative Bustos explained that she was inspired to write the legislation after reading the Washington Post Article and learning how Signet's mandatory, "secret arbitration process" had kept the facts about its culture of sexual harassment from being widely known:

The idea of this legislation came to me actually in February. It was a Monday night, and I'm reading the Washington Post. Thank you to our reporters – I'm a former reporter – thank you to our reporters for uncovering what is going out there. I read that night about a story that involved Kay jewelry and Jared jewelry, and how they had a rigged system that allowed those in senior leadership to prey on women in the workforce. Here's what they reported. It detailed allegations of a chief executive who would only promote women who would sleep with him. It shed light on an alcohol-fueled managers' meeting where, of course, spouses were banned, and where dozens of women would go there and they would be groped, they would be demeaned, they would be harassed. Oh, and by the way, these meetings were mandatory for these women. The report in the Washington Post painted a troubling picture of a corporate culture that fostered systemic sexual harassment. And once the women had had it, they were totally fed up, they were disgusted by

46

this offensive behavior, and they finally decided that they were going to take action. So, they did what women who were sharing these stories would do, and they decided to file a class action suit. But as you can see, by those of us standing in front of you, there's not one woman from Kay jewelry or Jared jewelry. And you know why? Because, when they were hired, they filled out paperwork, just like when you start any new job, you sign your name on the paperwork, or you're handed an employee handbook, and it was slipped right under their nose and that took away their right to sue. So instead, when they brought these issues up, they were forced into a secret arbitration process, and that meant that their stories would never see the light of day, because of that employment agreement that they signed. So this is why we have to address institutionalized sexual harassment.

167.    On December 15, 2017, the Retail Dive – an industry publication – wrote that (as expected) Signet was losing customers over the sexual harassment issues.  Demonstrating that Signet was particularly vulnerable to the exact kind of sexual harassment issues that the Washington Post Article disclosed (and that investors would clearly care about), the article described industry research that women's' perception of Signet brands was more negative in light of the sexual harassment revelations.

168.    On April 23, 2019, the New York Times Magazine published an extensive account of Signet's culture of sexual harassment, including new and further interviews with victims.  The article also included a fulsome description of Signet's internal 'adjudication' system and how it was used to sweep incidents under the rug, with the author noting:

> Resolve was Sterling's most insidious tool; it was the lock box in which the company kept all of its good-old-boy behavior a secret; it's how the behavior was permitted to flourish, and it has proved neither efficient nor effective for the women involved.

169.    The New York Times Magazine article also further analyzed the redacted filings now available, in light of the interviews by the author, observing:

> It is Mark Light who, based on my interviews, is the subject of many redacted and nonredacted pages of the lawsuit filings, and who left to tend to an unnamed illness in 2017. (I tried to contact the executives whose names I came across, but none of my Facebook,

Twitter, LinkedIn InMail or text messages, or emails or phone calls, were returned, and a formal request to interview them through the company was denied.)

170.    The New York Times Magazine account also summarized documentation now available regarding Signet's culture – and it was ugly:

> Whether Sterling is guilty of pay-and-promotions discrimination doesn't seem as if it's up for debate. According to documents produced in discovery, as early as 2006, the vice president Michael Lynch alerted other executives that an internal study — titled "Post-Merit Field Operations EEOC Analysis" — found that female hourly sales employees were on average paid 40 cents less an hour than men. In bold, he wrote, "This equates to over 7 million annual affected hours." The arbitrator noted in her decision awarding class certification that Sterling didn't offer any alternative explanation of the data. (Sterling says this document is incomplete, but it would not provide me with any means to make it complete.)

171.    The article also reviewed documentation now available regarding Signet's knowledge of its culture – and it was extensive:

> There also doesn't seem to be a question, even by the company's own account, that a large amount of harassment was reported at Sterling. Tom Parks, one of five regional human-resources specialists, said in his deposition that he received thousands of calls each year. According to one of the claimants' expert reports, in 2006 alone, there were 19,321 calls, of which 11,851 involved discrimination complaints; 1,519 were about sexual harassment. When a case is investigated at Sterling, there are a series of steps followed, which conclude in a recommended response from H.R. Parks said that Sterling kept no data on whether recommendations were implemented. The worst part of the wage gap — other than all the other worst parts of the wage gap — is that when there's a disregard for women, pay disparity is often only a first indicator of the other stuff. The payroll records that covered Dawn's desk that day in 2005 lay atop hundreds of crimes that could have been predicted in a company culture where women were demonstrably valued less than men.

172.    Further, the article provided further evidence that Signet knew all along that sexual harassment allegations were not a minor, ignorable, part of the Jock litigation, but instead, that the

gender pay and promotion discrimination described in part of the *Jock* litigation was part and parcel of an overriding culture of sexual harassment at Signet – and that the Company concealed both its pervasive culture, and the sexual harassment focus of the Jock litigation, from investors and the public.

173.   Signet, while knowing full well about its ugly culture of sexual harassment, concealed that culture from investors, concealed that the Jock litigation concerned pervasive sexual harassment, and concealed the risk (later materialized) that when this issue was revealed, Signet's business, and thus investors' interests, would be harmed.

## **ADDITIONAL SCIENTER ALLEGATIONS**

174.   As set forth above and further below, numerous facts demonstrate that Defendants knew or, at minimum, recklessly disregarded that their statements were materially false and misleading.

175.   There can be no serious dispute that Defendants were aware of the facts detailed in the Declarations. Defendants had received the Declarations well before any of the misrepresentations or omissions alleged herein. Thus, contrary to their public statements, they knew that the *Jock* Actions did not merely concern "store-level" practices related only to pay and promotion activities, but rather detailed a pervasive culture of sexual harassment that reached the Company's highest levels.

176.   Further, the harassment was open, notorious, and widespread. Among other things, the harassment regularly occurred at the Company's gathering of executives known as the Managers' Meetings. And, according to the Declarants, it involved Defendant Light. Given Defendants' knowledge of this widespread conduct, they knew that their statements mischaracterizing the nature and scope of the arbitration, as well as their statements touting Signet's supposed ethical business conduct, were materially misleading at best.

177.   In addition, the information contained in the Declarations – and specifically the facts asserted as to Defendant Light – was repeatedly discussed at the highest levels of Signet. As noted above, the Signet Board had been repeatedly briefed on the litigation since 2008 and, when

considering Defendant Light for promotions had again reviewed this information. According to Signet's Chairman:

> As a Board, we have been briefed on this litigation since 2008. . . . When evaluating whether to make Mark Chief Operating Officer in 2014, we obviously reviewed his business performance and evaluated, with advice from counsel, the allegations that were described in connection with the case, reviewed the available information, the timeframes involved, and the context in which it was offered. . . . When the previous CEO departed the Company, we conducted a further confirmatory review, and Mark was appointed CEO.

178.    In short, Defendants were well aware of the facts set forth in the Declarations when they made the misrepresentations and omissions at issue.

## VII.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

179.    Throughout the Relevant Period, Defendants made numerous materially false and misleading statements and omissions including those concerning: (1) the culture of sexual harassment at Signet, including the nature and risks of the lawsuits it was facing; and (2) the conduct of its business, particularly as it related to ethical standards and sexual harassment.

### A.    Materially False And Misleading Statements And Omissions in the Fiscal 2016 Form 10-K

180.    On March 24, 2016, Signet filed with the SEC its Form 10-K for the fiscal year ended January 30, 2016 ("Fiscal 2016 Form 10-K"), which was signed by Defendant Light and Defendant Santana.

181.    In this filing, Signet made false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Fiscal 2016 Form  10-K, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the

District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. <u>The Claimants filed a motion for class certification and SJI opposed the motion.</u>

* * *

Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. <u>The EEOC 's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.</u>

* * *

SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

182.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

183.    Also in the Fiscal 2016 Form 10-K, Signet provided that it was exposed to the following risk factor (bold and italics in original):

> ***<u>Loss of confidence by consumers in Signet's brand names</u>, poor execution of marketing programs and reduced marketing expenditure <u>could have a detrimental impact on sales.</u>***

Primary factors in determining customer buying decisions in the jewelry sector include customer confidence in the retailer and in the brands it sells, together with the level and quality of customer service. The ability to differentiate Signet's stores and merchandise from competitors by its branding, marketing and advertising programs is an important factor in attracting consumers. If these programs are poorly executed, the level of support for them is reduced, or the customer loses confidence e in any of Signet's brands for whatever reason, it could unfavorably impact sales and earnings.

184.    This statement was materially false and misleading. It was materially false and misleading for Signet to represent that the risk of customers losing confidence in the Company's brands was merely hypothetical when Signet knew that it was, in fact, already facing a highly material risk that customers would lose confidence in its brands. Indeed, as set forth above, Signet knew that there was a pervasive culture of sexual harassment at the Company, and that this information was highly likely to become public.

185.    The Fiscal 2016 Form 10-K further provided that Signet was exposed to the following additional risk factor (bold and italics in original):

> ***Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders whose behavior may be affected by its management of social, ethical and environmental risks.***
>
> Social, ethical and environmental matters influence Signet's reputation, demand for merchandise by consumers, the ability to recruit staff, relations with suppliers and standing in the financial markets. Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders: customers, shareholders, employees and suppliers. In recent years, stakeholder expectations have increased and Signet's success and reputation will depend on its ability to meet these higher expectations. Signet's success also depends upon its reputation for integrity in sourcing its merchandise, which, if adversely affected could impact consumer sentiment and willingness to purchase Signet's merchandise.

186.    This statement was materially false and misleading. It was false and misleading for Signet to represent that that the behavior of stakeholders, including "employees," "may be affected

by its management of social, ethical, and environmental risks," when this risk had already materialized, and Signet's "employees" already <u>had</u> been affected by the Company's pervasive culture of sexual harassment.

## B.  <u>Materially False And Misleading Statements And Omissions in the First Quarter 2017 Form 10-Q</u>

187.  On June 3, 2016, Signet filed with the SEC its Form 10-Q for the quarter ended April 30, 2016 ("First Quarter 2017 Form 10-Q"), which was signed by Defendant Light and Defendant Santana.

188.  At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the First Quarter 2017 Form 10-Q, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that <u>US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender.</u> In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. <u>The Claimants filed a motion for class certification and SJI opposed the motion.</u>

> \* \* \*

> Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. <u>The EEOC 's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.</u>

> \* \* \*

> SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or

> possible loss or range of losses, if any, arising from the litigation is
> able to be estimated.

189.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

190.    Also in the same filing, Signet stated that "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2016 Annual Report on Form 10-K, filed with the SEC on March 24, 2016."

191.    This statement incorporates by reference the statements discussed in ¶183 and ¶185. Those statements remained false and misleading for the reasons identified in ¶184 and ¶186.

C. **Materially False And Misleading Statements And Omissions in the Second Quarter 2017 Form 10-Q**

192.    On August 31, Signet filed with the SEC its Form 10-Q for the period ended July 30, 2016 ("Second Quarter 2017 Form 10-Q"), which was signed by Defendant Light and Defendant Santana.

193.    At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Second Quarter 2017 Form 10-Q, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that <u>US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender.</u> In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. <u>The Claimants filed a motion for class certification and SJI opposed the motion.</u>

\* \* \*

Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. <u>The EEOC 's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.</u>

\* \* \*

SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

194.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

195.    Also in the same filing, Signet stated, with respect to the relevant risk factors, that "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2016 Annual Report on Form 10-K, filed with the SEC on March 24, 2016."

196.    This statement incorporates by reference the statements discussed in ¶183 and ¶185. Those statements remained false and misleading for the reasons identified in ¶184 and ¶186.

**D.   Materially False And Misleading Statements And Omissions in the Third Quarter 2017 Form 10-Q**

197.    On November 29, 2016, Signet reported additional financial metrics. Specifically, Signet filed with the SEC its Form 10-Q for the quarter ended October 29, 2016 ("Third Quarter 2017 Form 10-Q"), which was signed by Defendant Light and Defendant Santana.

198.    Scopia began purchasing Signer common stock at inflated prices days after this filing.

199.     In this filing, Signet made false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Third Quarter 2017 Form 10-Q, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion.
>
> * * *
>
> Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC 's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and

> promotions of female retail store employees from January 1, 2003
> to the present.
>
>                                             \* \* \*
>
> SJI denies the allegations of the Claimants and EEOC and has been
> defending these cases vigorously. At this point, no outcome or
> possible loss or range of losses, if any, arising from the litigation is
> able to be estimated.

200.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

201.    Also in the same filing, Signet stated, with respect to the relevant risk factors, that "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2016 Annual Report on Form 10-K, filed with the SEC on March 24, 2016."

202.    This statement incorporates by reference the statements discussed in ¶183 and ¶185. Those statements remained false and misleading for the reasons identified in ¶184 and ¶186.

### Additional False and Misleading Statements Regarding Signet's Code of Conduct

203.    During the Relevant Period, Signet repeatedly made available to investors its Codes. The Code of Conduct explained that (i) Signet was committed to a workplace free from sexual harassment, (ii) the Company based its employment and promotion decisions, among other things, "solely" on ability and potential in relation to job needs, (iii) the Company would protect persons who reported ethical concerns and had confidential and anonymous processes for

reporting concerns, and (iv) sexual harassers would be disciplined.   As stated above, the Codes also provided specific duties for Signet's officers in enforcing the Codes.

204.    Statements from the Codes were substantially re-adopted each year by the Board and published on Signet's website before and during the Relevant Period. Signet also incorporated these documents by reference into SEC filings before and during the Relevant Period.   Signet included false statements in re-adopting its Codes, at minimum, on March 3, 2016.

205.    In the Fiscal 2015 Form 10-K, during the Relevant Period, Signet incorporated its false and misleading Codes by reference.

## In Direct Communications to Scopia, Signet Fails to Disclose its Pervasive Culture of Sexual Harassment

206.    On multiple occasions, analysts at Scopia emailed or spoke to representatives of Signet during the relevant period.

207.    Despite multiple communications from Signet to Scopia, and despite that Signet knew or should have known Scopia was an investor in Signet, Signet never informed Scopia about Signet's pervasive culture of sexual harassment, the true nature of the actions, Signet's rampant violations of its own code of conduct (rendering its statements about the Code false or otherwise misleading) or other facts Signet hid alleged herein.

## LOSS CAUSATION

208.     The market price of Signet's publicly traded common stock was artificially inflated by the material misstatements and omissions complained of herein.

209.    The market price of Signet's publicly traded common stock was artificially inflated by the material misstatements and omissions regarding the Actions and the culture of rampant sexual harassment pervading the Company, as well as Signet's code of conduct.   The misstatements and omissions by Defendants regarding Signet's culture of sexual harassment, the *Jock* Litigation, and its Code of Conduct maintained the artificial inflation in Signet's common

stock throughout the Relevant Period here, until it was dissipated by corrective events starting in February 2017.

210.     The artificial inflation in Signet's stock price was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market. This information was disseminated via a corrective disclosure on the evening of February 27, 2017, and then the further materialization of the undisclosed risk on March 7th, 10th, 13th, and 14th 2017.

211.     On February 27, 2017, after market close, *the Washington Post* published an article describing the contents of hundreds of sworn Declarations, submitted as part of class certification briefing in the *Jock* Arbitration and made public for the first time – after years of wrangling with Signet – the night before. The Declarations and the Washington Post Article described a culture of pervasive sexual harassment and gender discrimination at Sterling, and for the first time, provided the market with a comprehensive understanding of that culture of sexual harassment at the Company, including the fact that there was significant evidence demonstrating that it reached to Signet's highest levels.

212.     These revelations shocked the market, and the market reacted immediately. Signet stock closed at $72.88 per share on February 27, 2017, just hours before the Washington Post Article was published. It opened on the morning of February 28 at $68.90, and, by 11:22 a.m. that day, it was down 8.3% from the previous day's close, to $66.89. At that time, the Company halted trading pending a press release. Thirty minutes later, Signet issued a press release stating that the allegations in the article were "misleading" and "inaccurate." Given all they had learned from the Washington Post Article and the Declarations, investors were not reassured: Signet stock continued to plummet and, by day's end on February 28, Signet was trading at $63.59, down from the previous day's close of $72.88 by $9.29 per share, or 13%, on extraordinary volume of 11,317,100 shares.

213.     *The Washington Post* Article also materialized the until-then-undisclosed risk of Signet's pervasive culture of sexual harassment and that the *Jock* litigation concerned that culture.

214.    In addition, further reporting on Signet's culture of sexual harassment and the true nature of the Jock litigation continued from March 7th, and 10th to 14th, leaking additional information into the market. During this period, Signet stock suffered the foreseeable effects of the revelation of the fraud, and the foreseeable effects of the materialization of the undisclosed risk.

215.    On March 7th, Signet stock declined over 3.5%; from March 10th to 14th, as the news about Signet continued to be dominated by sexual harassment issues, Signet stock declined a collective 3.16%.

216.    Signet's stock price declines on March 7th, and 10th to 14th were the result of information leaking into the market and the materialization of the previously undisclosed risks.

217.    The decline in Signet's stock price on the above dates was a direct and proximate result of Defendants' scheme being revealed to investors and to the market.

218.    Internally, on at least February 28, 2017 and March 2, 2017, Signet lawyers were discussing media coverage of the *Jock* arbitration, and Signet's response, indicating that Signet continued to focus on the materialization of this concealed risk into March 2017.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

219.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

220.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an

executive officer of Signet who knew that the statement was materially false or misleading when made.

## **RELIANCE**

### A. The Presumption of Reliance/Fraud on the Market

221.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omission of material facts that there was a duty to disclose.

222.    Plaintiffs are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, before and during the Relevant Period:

    a.   Signet's common stock was actively traded in an efficient market on the New York Stock Exchange;

    b.   Signet's common stock traded at high weekly volumes;

    c.   As a regulated issuer, Signet filed periodic public reports with the SEC;

    d.   Signet was eligible to file registration statements with the SEC on Form S-3;

    e.   Signet regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

    f.   The market reacted promptly to public information disseminated by Signet;

    g.   Signet securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

    h.   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Signet securities; and

      i.    Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs purchased or acquired Signet common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

223.    The Court overseeing the Class Action has found, in a July 10, 2019 Order, that Signet stock traded in an efficiency market during a period encompassing the Relevant Period here.

224.    Accordingly, Plaintiffs relied, and are entitled to have relied, upon the integrity of the market prices for Signet's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Relevant Period.

**B.  Actual Reliance**

225.    Plaintiffs, through Scopia, actually, read (or heard), reviewed, and relied upon Defendants' misrepresentations prior to purchasing Signet stock.

226.    Scopia began purchasing signet common stock for Plaintiffs in December 2016.

227.    Prior to purchasing Signet stock for Plaintiffs, one or more employees of Scopia actually read, reviewed and relied upon Signet's public disclosures, investor presentations and financial statements, including Signet's Forms 10-Q and Form 10-K.

228.    As Plaintiffs continued to purchase Signet stock throughout December 2016, January 2017 and February 2017, Scopia kept abreast of publicly-disclosed developments concerning Signet, and prior to purchasing stock, as applicable, actually read (or heard), reviewed, and relied upon Signet's SEC filings, including but not limited to the following documents and items:

    a.      Fiscal 2016 Form 10-K
    b.      First Quarter 2017 Form 10-Q
    c.      Second Quarter 2017 Form 10-Q
    d.      Third Quarter 2017 Form 10-Q

229.    When purchasing Signet stock on behalf of Plaintiffs, employees at Scopia, in particular analysts reviewing the Signet stock, actually read (or heard) and relied on each of the filings noted above.

230.    Had Scopia known the truth, it would not have purchased Signet common stock on behalf of Plaintiffs or, if it had done so, would not have paid the price it did.

### CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE
### ACT AND RULE 10b-5 PROMULGATED THEREUNDER
### (Against All Defendants)

231.    Plaintiffs repeat and reallege the paragraphs above as if set forth herein.

232.    This Cause of Action is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

233.    Defendants both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Signet common stock; and (iii) cause Plaintiffs to purchase Signet common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct Defendants took the actions set forth above.

234.    Defendants both directly and indirectly:  (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Signet common stock in an effort to artificially inflate and maintain the market prices for Signet common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

235.    By virtue of their high-level positions at the Company, the Executive Defendants were authorized to make public statements, and made public statements on Signet's behalf.  These senior executives were privy to and participated in the creation, development, and issuance of the

materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

236.    In addition, Defendants had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading, including information with respect to Signet's credit portfolio, so that the market price of the Company's securities would be based on truthful, complete and accurate information.

237.    Defendants acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.  Defendants' material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Signet's credit from the investing public, including misstating the accuracy of Signet's financial statements, the health of the credit portfolio, the accuracy of the loss reserves, and the risk of the credit portfolio to Signet.  By concealing these material facts from investors, Defendants supported the artificially inflated price of Signet common stock.

238.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Signet's common stock.  In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Signet, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiffs purchased Signet common stock at artificially inflated prices. As a series of partial but inadequate disclosures were issued, the price of Signet's securities substantially declined.

239.    At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of Signet, which was concealed by

Defendants, Plaintiffs would not have purchased Signet common stock, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

240.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

241.    As a direct and proximate result of Defendants, wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in the Company's securities.

242.    Taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.), Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## COUNT II
## VIOLATIONS OF SECTION 18 OF THE EXCHANGE ACT
### (With respect to the Form 10-K Filed March 24, 2016)

243.    Plaintiffs repeat and reallege each and every allegation above as if set forth herein.

244.    As alleged herein, Defendants made or caused statements to be made in Signet's Form 10-K for the fiscal year ended January 30, 2016 concerning the Actions, Signet's code of ethics/conduct, and Signet's risks.

245.    In purchasing Signet common stock, Plaintiffs' investment team actually read, and had direct eyeball reliance on, Signet's Form 10-K for the fiscal years January 30, 2016.

246.    Specifically, Plaintiffs' investment advisor read and actually relied upon information regarding Signet's disclosed risks contained in Signet's Form 10-K for the fiscal year ended January 30, 2016 in making each purchase or acquisition set forth in the Exhibits on behalf of Plaintiffs.

247.    In ignorance of the falsity of Defendants statements and omissions, or of the true facts, Plaintiffs purchased Signet common stock in actual, eyeball reliance upon Defendants' representations.

248.    Defendants' materially false and misleading statements and omissions of material fact artificially inflated the price of Signet's common stock.

249.    Had they known the true facts, Plaintiffs would not have purchased Signet common stock and/or would not have purchased them at the inflated prices they paid.

250.    Upon the partial disclosure of the true facts, the prices of Signet common stock dropped, and Plaintiffs suffered damages in an amount to be proven at trial.

251.    By reason of the foregoing, Defendants are liable to Plaintiffs for violations of Section 18 of the Exchange Act, 15 U.S.C. § 78r.

252.    Taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.), Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## COUNT III
## VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against all of the Individual Defendants)

253.    Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

254.    To the extent that any of Executive Defendants are not found to be liable for any of the statements in the First and Second Causes of Action above, this Count is asserted in the alternative against the Executive Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

255.    The Executive Defendants were at the time of the wrongs alleged herein each a controlling person of CBI within the meaning of Section 20(a) of the Exchange Act.

256.     As alleged herein, the Executive Defendants caused Signet to violate Sections 10(b) and 18 of the Exchange Act and Rule 10b-5 promulgated thereunder, by making material misstatements and omissions in connection with the purchase and sale of securities.

257.     The Executive Defendants had the power and influence, and did in fact exercise that power and influence, to cause Signet to issue the statements set forth above.

258.     As the CEOs or CFOs of Signet, the Executive Defendants were intimately familiar with, and exercised substantial control over, every aspect of Signet's business.  The Executive Defendants made numerous representations directly to investors about Signet, including its credit portfolio.

259.     By reason of the conduct alleged herein, Signet is liable for violations of Sections 10(b) and 18 of the Exchange Act and Rule 10b-5 promulgated thereunder, and the Executive Defendants are liable based on their control of Signet.

260.     The Executive Defendants culpably participated in Signet's violation of Sections 10(b) and 18 and Rule 10b-5, because they knew or recklessly ignored the true state of Signet's credit portfolio, lending standards, loss reserves, and the risks of the credit portfolio to Signet.

261.     The Executive Defendants are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages which Plaintiffs suffered in connection with their purchases of Signet common stock.

262.     Taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.), Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

### COUNT IV
### COMMON LAW FRAUD
### (Against All Defendants)

263.     Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

264.    Defendants made, authorized or caused the representations and/or omissions set forth above.

265.    Those representations and omissions were material.

266.    The material representations set forth above were knowingly made by such Defendants with the intent to deceive, and such Defendants' representations omitted and concealed material statements of fact from Plaintiffs.

267.    Each such Defendant knew its representations were false and/or misleading, and their omissions were material and rendered their representations misleading, at the time they were made or omitted.

268.    Defendants knew that Plaintiffs would receive and rely on such representations, and intended that their false and/or misleading statements would induce Plaintiffs to purchase Ocwen common stock at inflated prices.

269.    Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions.  Plaintiffs would not have purchased Signet common stock at all, or at the prices they paid, had they known the true facts regarding Signet's credit portfolio.

270.    As a direct and proximate result of such reliance, and these Defendants' fraudulent misconduct, Plaintiffs have suffered damages.

271.    Plaintiffs could not have discovered the true facts until at least such time as corrective information entered the market and thus, where a discovery rule is applicable, Plaintiffs' cause of action did not begin to accrue until such time as corrective information placed them on notice of Defendants' fraud. Consequently, this action is timely.

272.    As applicable, taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Signet Jewelers Limited Securities Litigation* 16-cv-06728 (S.D.N.Y.), Plaintiff has brought this claim within the relevant statute of limitations period.  Consequently, this action is timely.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests relief and judgment, as follows:

(a)     Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)     Awarding Plaintiffs punitive damages;

(c)     Awarding Plaintiffs their attorneys' fees and costs; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: October 25, 2019

New York, New York

**LOWENSTEIN SANDLER LLP**

By:   /s/ *Lawrence M. Rolnick*
      Lawrence M. Rolnick
      Marc B. Kramer
      Richard A. Bodnar
      Jennifer A. Randolph
      Nicole Castiglione
      1251 Avenue of the Americas
      New York, NY 10020
      Tel. 212-262-6700

      &

      Thomas E. Redburn, Jr.
      (*pro hac vice* forthcoming)
      One Lowenstein Dr.
      Roseland, NJ 07068